## In re Carl Wehlitz.

The provisions of the act of congress of July 17, 1862, authorizing the President to make the necessary rules and regulations for drafting the militia, in cases where the laws of the states had not made a sufficient provision for that purpose are valid. In re Griner, *ante*, 423.

Each state being sovereign, except as to matters referred to the general government, may as the result of that sovereignty, confer the rights of citizenship on whomsoever it pleases, so far as to make him a citizen of such state, though he will not thereby become a citizen of the United States.

A resident alien, who declares his intention to become a citizen of the United States,

pursuant to the naturalization laws of the United States, becomes thereby, under the constitution and laws of this state, a citizen thereof.

A resident alien, on whom the rights of state citizenship have been conferred, and who has exercised the right of suffrage in this state, is liable to be drafted into the military service of the United States, under the provisions of the acts of congress of May 8th, 1792, and July 17, 1862.

CERTIORARI to a Court Commissioner for *Milwaukee* County.

*Carl Wehlitz*, the petitioner, was born in the kingdom of Prussia, and came to the United States in 1854, after which, and before his enrollment on the militia list of the 9th ward of the city of Milwaukee, of which he was a resident, he declared his intention to become a citizen of the United States, in conformity with the laws of the United States, but had not been admitted to citizenship or taken the final oath required by law. On the 19th day of November, 1862, he was drafted from the 9th ward of the city of Milwaukee, into the military service of the United States, under the several acts of congress on that subject, and the orders of the war department, and of the President, and was detained for that reason to do military duty, as one of the drafted militia, in the 34th Wisconsin regiment of infantry, by the commandant thereof, Col. Fritz Anneke. He applied for and obtained from James Mitchell, Esq., court commissioner for Milwaukee county, a writ of *habeas corpus*, directed to Col. Fritz Anneke. The writ was properly returned, and upon a hearing, it appeared that the petitioner, after he had declared his intention of becoming a citizen of the United States, had on several occasions exercised the right of suffrage under the constitution and laws of this state. The commissioner, after the hearing before him, when the foregoing facts were made to appear, decided that the petitioner was not liable to be drafted into the military service of the United States, and made an order discharging him from the custody and restraint of which he had complained. The case came before this court for review, on a writ of *certiorari*.

*Smith & Cotzhausen*, for petitioner.

*Winfield Smith*, Attorney General, for respondent.

*By the Court*, PAINE, J.    This matter was decided by a court commissioner of Milwaukee county, who made an order discharging the petitioner, and it has been brought here by a writ of *certiorari*.

We have already decided in the application of *Frederick Griner et al.*, *ante*, 423, for a writ of *habeas corpus*, that the act of congress of July 17, 1862, authorizing the President to make the necessary rules and regulations for drafting the militia in cases where the laws of the states had not made a sufficient provision for that purpose, was valid. The only question left then to be determined in this case, is whether a resident of this state who was a native of a foreign country, but who had declared his intention to become a citizen of the United States, and taken out his first papers in accordance with the law of congress, and had exercised the right of voting under the constitution and laws of this state, all of which was true of the petitioner, was liable to be drafted ?

The decision of this question depends upon the meaning of the several acts of congress, and the laws of this state, in regard to the militia. For it has been the policy of the general government in all of its legislation hitherto upon this subject, to trust so much to the action of the states, that it becomes necessary to consider the entire system of legislation both state and federal, to have a correct understanding of the laws of either.

The act of congress providing for the organization of the militia, approved May 8th, 1792, designated as the persons to be enrolled, "every free, able-bodied, white male *citizen of the respective states*, resident therein, &c." Prior to 1858, the law of this state provided that "every free, able-bodied, white, male *person* who has resided within this state one month, and is between the ages of eighteen and forty-five, shall be enrolled in the militia, &c." Sec. 5, chap. 31, R. S., 1858. But section one of chapter 87 of the general laws of 1858, which is found as a part of the chapter just referred to, designated as those who

should be liable to military duty, "all able-bodied, white, male citizens, &c."

The act of congress of July 17, 1862, before referred to, provided that in all cases, the enrollment should "include all able-bodied male citizens, &c." It thus appears, that in the laws both of this state and the United States, now in force, the word " *citizen* " is used as descriptive of the persons liable to enrollment in the militia. The decision must therefore depend upon the meaning of that word.

The commissioner decided that it meant only those who were full citizens of the United States. But before that conclusion can be adopted, it will be necessary to inquire whether the word has any other well recognized meaning, not necessarily including the full rights of citizenship of the United States, and if so, then to determine in which sense it was used in these laws. That it has such another meaning must be admitted. Under our complex system of government, there may be a citizen of a state, who is not a citizen of the United States in the full sense of the term. This result would seem to follow unavoidably from the nature of the two systems of government. Each state being sovereign, except as to matters referred to the general government, may, as an undoubted result of that sovereignty, confer such rights of citizenship as it pleases, so far as it relates to itself only. But the power having been delegated to congress to pass uniform naturalization laws, and it being exclusive in its character, no state can confer such rights of citizenship upon an alien who has not complied with the laws of congress, so as to make him a citizen of the United States, and entitled to the rights and privileges guaranteed to citizens by the federal constitution.

This doctrine has been recently very clearly stated by the supreme court of the United States, in the Dred Scott case, in which the question was, whether a negro could be a citizen of a state, within the meaning of the constitution of the United States, so as to be entitled to sue in the federal courts, that

·court said: "In discussing this question, we must not confound the rights of citizenship, which a state may confer within its own limits, and the rights of citizenship as a member of the Union. It does not, by any means follow, because he has all the rights and privileges of a citizen of a state, that he must be a citizen of the United States. He may have all the rights and privileges of the citizen of a state, and yet not be entitled to the rights and privileges of a citizen in any other state. For previous to the adoption of the constitution of the United States, every state had the undoubted right to confer on whomsoever it pleased the character of a citizen, and to endow him with all its rights. But this character of course was confined to the boundaries of the state, and gave him no rights or privileges in other states beyond those secured to him by the laws of nations and the comity of states. Nor have the several states surrendered the power of conferring these rights and privileges by adopting the constitution of the United States. Each state may still confer them upon an alien or any one it thinks proper, or upon any class or description of persons; yet he would not be a citizen, in the sense in which that word is used in the constitution of the United States, nor entitled to sue as such in one of its courts, nor to the privileges and immunities of a citizen in the other states. The rights which he would acquire would be restricted to the state which gave them. The constitution has conferred on congress the right to establish an uniform rule of naturalization, and this right is evidently exclusive, and has always been held by this court to be so; consequently, no state since the adoption of the constitution, can by naturalizing an alien invest him with the rights and privileges secured to a citizen of a state under the federal government, *although so far as the state alone was concerned, he would undoubtedly be entitled to the rights of a citizen, and clothed with all the rights and immunities which the constitution and laws of the state attached to that character.*" 19 How., p. 405.

The power of a state to confer a right of citizenship, so far

as it alone is concerned, and which does not amount to a full citizenship of the United States could not be more plainly stated, than it is in the above extract. It is true, however, that further on in the opinion, on page 422, the court says: " So, too, a person may be entitled to vote by the law of a state who is not a citizen even of the state itself; and in some of the states of the Union, foreigners not naturalized, are allowed to vote ; and the state may give the right to free negroes and mulattoes, but that does not make them citizens of the state, and still less of the United States." Still, what is here said does not detract at all from the broad doctrine stated in the former extract. It means no more than this, that the state may confer the right to vote, without necessarily making those on whom it is conferred citizens of the state even. This may possibly be true; but the power of the state being conceded to confer the rights of citizenship within itself upon whomsoever it pleases, the question whether it has done so or not is a mere question of intention, to be determined by a proper construction of its own constitution and laws, and one also which the supreme tribunal of each state is to determine for itself. This being so, although it may be possible for the state to confer the right of voting on certain persons without making them citizens, yet I should think it would require very strong evidence of a contrary intention, to overcome the inference of an intention to create a citizenship when the right of suffrage is conferred. The remarks of Justice CURTIS, in his dissenting opinion in the Dred Scott case, (19 How., p. 581,) states the true effect which ought to be given to the existence of this right. He says : "But further, though, as I shall presently more fully state, I do not think the enjoyment of the elective franchise essential to citizenship, there can be no doubt it is one of the chiefest attributes of citizenship, under the American constitution ; and the just and constitutional possession of this right is decisive evidence of citizenship. The provisions made by a constitution on this subject must, therefore, be look-

ed to as bearing directly upon the question what persons are citizens under that constitution." Indeed it is often used in a general sense as meaning only a permanent resident. That is one of the definitions given by Webster. So, in *Field et al vs. Anderson et al,* 7 Maryland, 209, it was held that a resident alien, who had not declared his intentions and was entitled to no political rights under the laws of the state, was still a "citizen" within the meaning of the attachment laws of that state against "absconding citizens." Yet, it is true, that in a political sense, the word citizen implies the possession of political rights. But the rights of voting and holding office are always given as the most complete and perfect attributes of citizenship. Thus, Webster gives the following definition: "In the United States, a person, native or naturalized, who has the privilege of exercising the elective franchise, or the qualifications which enable him to vote for rulers and to purchase and hold real estate." Bouviers' definition is as follows: "One who, under the constitution and laws of the United States, has a right to vote for representatives in congress and other public officers, and who is qualified to fill offices in the gift of the people." Burrill gives the same definition.

Bearing in mind, then, that the inquiry relates only to such rights of citizenship as this state could confer, with respect to itself alone, how should it be determined upon our constitution, with respect to the class of persons to which the petitioner in this case belongs. The answer must be, that there is no room for doubt, that it was the intention to confer upon such persons, as far as it was possible for the state to do so, the full rights of state citizenship. In the first place, those persons had an equal voice with any other citizens in establishing the constitution itself. By section 9, article 14, they were authorized to vote upon its adoption or rejection. By the article on suffrage, they are made qualified electors, and are eligible to all offices, except as governor, lieutenant governor or judges. If the granting of these rights, the right to participate in estab-

lishing the very framework of the government, of an equal voice in choosing all officers under it, and the right to hold all offices with a very few exceptions, does not indicate an intention to create them citizens of the state, it is difficult to imagine from what such an intention could be inferred. This distinction between citizenship of the state and of the United States, is also very clearly implied in several provisions, both of the constitution and laws of this state. There, wherever the full right of citizenship of the United States is intended, it is so expressed, as in respect to the office of governor, lieutenant governor or judge, it is provided that no person shall be eligible who is not a "citizen of the United States." This form of expression never would have been used if it had been supposed that no person could be a citizen of the state without being also a citizen of the United States. In that case, the word "citizen" alone would have been used. An instance of this kind is found in the bill of rights, section 15, which provides that "no distinction shall ever be made by law between resident aliens and *citizens*, in reference to the possession, enjoyment or descent of property." Now it seems very clear that the words, "resident aliens," as here used, were not intended to include those who had declared their intentions to become citizens, and thereby become entitled, under the constitution, to all the rights of citizenship before referred to. The framers would hardly have assumed, that any distinction would have been made against them, in respect to rights of property. But this provision was intended for the benefit of those who were resident aliens simply, and all who were entitled to political rights, were included by the word "citizens," which meant only, citizens of this state.

So also the second section of the article on suffrage, which provides that no person "convicted of treason or felony shall be qualified to vote at any election unless restored to civil rights," clearly assumes that any elector under the constitution may be guilty of treason against the state; but he could not

be guilty of treason unless a citizen.   And if this class of per-
sons are not citizens they might levy war against this state and
adhere to its enemies; though, perhaps, filling at the same
time some of its highest offices, and yet not be punishable for
treason ; a position in which it cannot be assumed that any
government would intentionally place itself.   It is also worthy
of remark, that although the state cannot make such persons
full citizens of the United States, yet by making them electors
of the state, it thereby gives them an equal voice with any
other citizen, in choosing senators and representatives in con-
gress, and also in choosing the President and Vice-President of
the United States.   For, by the constitution of the United
States, representatives are chosen by the " qualified electors of
the most numerous branch of the state legislature." Senators
are chosen by the legislature, and presidential electors in such
manner as the state legislature may direct.   Notwithstanding,
therefore, the constitution conferred upon congress the power
of providing uniform naturalization laws ; and, notwithstand-
ing it must be admitted that an alien cannot become a full
citizen of the United States except by complying with these
laws, it must also be admitted that the state may, by conferring
upon them the right of suffrage, enable them to have an equal
voice with any other citizen in the government of the United
States itself; and, although they may not be full citizens, they
may well be said, in a general sense, to be citizens even of the
United States.

Indeed, it was held in a memorable instance, fresh in the
memory of all, that a foreigner who had declared his inten-
tions under the laws of congress, in the state of New York,
whose constitution and laws did not confer on him any politi-
cal rights or make him a citizen of that state, although not a full
citizen of the United States, was still a " domiciled citizen" in-
vested with a national character as such, and entitled to the
protection of our government abroad.   And congress awarded
a medal to the gallant commander INGRAHAM, who so promptly

extended that protection to the Hungarian exile, who had declared his intention to become a citizen of the United States. The following extract from a letter of Secretary MARCY, in the correspondence which followed, is not inappropriate to the present discussion. He says: "This right to protect persons having a domicile, though not native born or naturalized citizens, rests on the firm foundation of justice; and the claim to be protected is earned by considerations which the protecting power is not at liberty to disregard. Such domiciled citizen pays the same price for his protection as native born or naturalized citizens pay for theirs. He is under the bonds of allegiance to the country of his residence, and if he breaks them incurs the same penalties; he owes the same obedience to the civil laws and must discharge the duties they impose on him; his property is in the same way and to the same extent, liable to contribute to the support of the government; in war he shares equally with them in the calamities which may befall the country; *his services may be required for its defense;* his life may be periled and sacrificed in maintaining its rights and vindicating its honor. In nearly all respects his and their condition, as to the duties and burdens of government are undistinguishable." If this is true in respect to the relation between the government of the United States and a foreigner, who has declared his intention to become a citizen, in a state which does not for that reason confer on him any political rights, it is much more true in a case where a state does confer upon such person the rights of citizenship and the qualifications of an elector, thereby making him also an elector of the United States, and entitled to a voice in choosing its highest officers. And, upon the question of state citizenship, between the state and such person, so far as it is possible for the state to create state citizenship, there is no room for doubt. If then the liability of this petitioner to be drafted, depended upon the meaning of the word "citizen" in our state law, I should have no hesitation in saying that he was liable. In this act the

word " citizen" only is used, but where the legislature intends full citizens of the United States, they say so. Thus in the law concerning jurors, it is provided that none shall be drawn who are not " citizens of the United States." A good reason for this discrimination is found in the fact that jurors are drawn by lot, and while persons who have declared their intentions are made electors and allowed to hold office, yet it might, perhaps, be safely assumed that no person not competent would be elected to office. But many foreigners who come here are not only unacquainted with our laws and modes of proceeding, but ignorant also of our language ; and, jurors being drawn by lot, if all were liable to be drawn as soon as they had declared their intentions, many might be drawn who were wholly unable to discharge the duties. Hence this discrimination in the law on that subject; but no such reasons exist why these persons should not share the burdens of the common defense ; therefore, the militia law drops the language which is used when a full citizenship of the United States is intended, and provides that all able bodied " citizens" shall be liable to military duty This change of phraseology was not accidental or unmeaning, but was entirely based upon the well understood distinction between a citizen of the state merely, and a citizen of the United States. The commissioner who decided this case below, considered the change in our law from the word " person" to the word " citizen" as very important, and as having been done with the intention to exclude persons who had declared their intentions. But that change is easily accounted for without assuming any such purpose. The word person, in the old law, would have included aliens who had not declared their intentions at all. It was to exclude them that the change was made ; and it does not at all warrant the conclusion that the legislature designed to exclude all who were not full citizens of the United States. On the contrary, by omitting the language with which that intention is always expressed, it appears clearly that they had no such purpose.

And I think the word "citizen" was used in the acts of congress in the same sense. The original act of 1792, as already shown, provided for the enrollment of all "able bodied white male citizens *of the respective states.*" This language expressly refers to a citizenship of the states; and, although the same language might sometimes be construed to mean only such a state citzenship, as brought the party within the full meaning of all the constitutional provisions of the United States; yet the very nature of the subject matter of this law, seems to me fully to exclude any such intention. It was a question merely as to what persons should be liable to share the burdens of the common defense, and as between the state and all persons, who by its constitution and laws, were made citizens of it; there can be no doubt that all such persons ought to share the burdens equally. And there is no ground for supposing that congress intended, by the words " citizens of the respective states," to exclude any who were citizens to all intents and purposes, as between the state and them.

This conclusion is strengthened by the use of the word "white" in that law. The supreme court of the United States, in the *Dred Scott case*, 19 How., 420, says that the word "white" was used in this law "to exclude the African race, and the word 'citizen' to exclude unnaturalized foreigners."

Now, whether the use of the word "white" as qualifying " citizen," for the purpose of excluding the African race, would indicate, that in the opinion of congress, the African race could not be citizens at all, may perhaps be very questionable. Its use for such a purpose would, by the ordinary rules of construing language, seem to imply that those who used it, understood that if it was not so qualified the African race might be included by the word " citizens." If that race could not be citizens at all, they, as well as naturalized foreigners, would have been included simply by the word citizens. But assuming, as that court decided, that the African race could not be citizens, within the full meaning of that word, as used

by the .constitution of the United States, yet that they might be citizens of the states, in that sense in which each state could confer citizenship within itself, and that all this was understood by the congress which enacted this law, then the use of the word " white " for the purpose of excluding the African race, can only be accounted for, upon the theory that the word citizen was not used in its fullest constitutional sense, but as referring to the state citizenship before alluded to. It could only have been that meaning of the word " citizen " which justified or required the use of the word " white." And with this meaning, the word "citizen" would include persons in this state, of the class to which the petitioner belongs.

But even if there were doubts as to the correctness of this construction of the law of 1792, there can be none as to its correctness when applied to the act of July 17, 1862, under which this draft took place. In the first place, that act referred to the matter of the laws of the several states, where they were insufficient. So this if this state had had a law sufficiently providing a mode of drafting, the petitioner, being liable to enrollment as a citizen under our law, would have been included. But it is un-reasonable to suppose that congress intended to allow such persons to be drafted where the state laws were sufficient, and yet to exclude them by the word " citizen " in cases where the President had to make rules and regulations for drafting. In this law, also, the word " white " is omitted, evidently for the purpose of removing the prohibition against the African race ; for the 12th section expressly authorizes the President to receive them into the military or naval service. This shows that the word " citizen " is still used with reference merely to state citizenship. This conclusion is strengthened also, by the provisions of another act of the same date. Chapter 200, Laws of Congress, vol. 12, p. 594. The 21st section enacts that any alien who should volunteer in the service of the United States, and be

afterwards honorably discharged, might become a citizen of the United States without any previous declaration of intention, and without being requi red to prove a previous residence of more than one year. Can it be possible that congress, anxious to fill the armies of the Union, and while passing one act to induce entire aliens, who had never declared their intentions at all, to enlist, intended, in another act passed at the same time, to exclude from liability to military duty, by the use of the word "citizen," those who had declared their intentions, who had become citizens of the state, and taken a part in the election of the highest officers of the United States? They never could have had such an intention. The word "citizen" referred to state citizenship, and was not intended to exclude those of the class to whom the petitioner belongs. The constitutions of several other states have extended to these persons rights of citizenship similar to those given by this state. They have enjoyed the privileges and protection of citizens; they have filled the offices, taken part in the enactment of state laws, and had an equal voice with others in the election of the officers and the enactment of the laws of the United States. They have found free homes among us, under our government established upon the principles of civil and religions liberty, and equality of rights among men. They have shared our prosperity, when we were prosperous and happy, and, by every principle of justice and every sentiment of honor, they ought to share the burdens in this hour of calamity and trial. And it is to be hoped that instead of shrinking from this high duty, they may be no less willing to bear their share of the burdens of war, than prompt to claim privilege and preferment in times of peace.

The order of the commissioner must be reversed.