STATE EX REL. WISCONSIN INSPECTION BUREAU and others, Appellants, vs. WHITMAN, Commissioner of Insurance, Respondent.

*May 14—July 17, 1928.*

474

476

478

482

For the appellants there were briefs by *Olin & Butler* of Madison, attorneys, and *Hicks & Folonie* of Chicago, of counsel, and oral argument by *Harry L. Butler*.

For the respondent there was a brief by the *Attorney General* and *Franklin E. Bump,* assistant attorney general, and oral argument by *Mr. Bump*.

ROSENBERRY, J. No case coming to the bar of this court can be treated or considered as unimportant. Some cases by reason of the public interests involved, the complexity of the problems presented, the magnitude of the interests affected, are of unusual importance. We recognize the fact that this is one of the second class and have given it the careful and thoughtful consideration which its importance demands.

The commissioner of insurance is an administrative officer. The office has long been known to the law. Because it was among the earlier administrative agencies created, the laws

delegating powers to insurance commissioners were very closely scrutinized and a rather rigid and inflexible application was made of the doctrine of separation of powers and its corollary that powers once vested cannot be redelegated. These earlier cases have continued to exert a restrictive influence upon the development of the powers of commissioners of insurance, whereas statutes creating other administrative agencies passed at a later date have received a much more generous and tolerant treatment than was accorded the early laws delegating powers to commissioners of insurance.[1]

The first question raised relates to the extent of the power which the legislature by the enactment of the rating law intended to confer upon the commissioner of insurance. This involves a consideration of the entire act and specifically sec. 203.36, Stats. (printed in the margin — p. 475). The significant words are as follows:

"All regulations or rules of any such rating bureau shall be filed with the commissioner of insurance, and no such regulations or rules shall be in force before such filing, nor, in any case, after written order by the commissioner of insurance, disapproving such regulations or rules."

On the one hand it is contended that all so-called riders which may be issued by a bureau must be submitted by the bureau to the commissioner and cannot be in force after the commissioner has disapproved the same. On the other hand it is said that the language referred to relates only to the internal management and control of the business of the rating bureau, has no application to riders prepared by the bureau for use by its members, and that the same are not subject to approval or disapproval by the commissioner.

In accordance with the provisions of the act a rating bureau was organized known as the Wisconsin Inspection

[1] See The Insurance Commissioner of the United States, Patterson, p. 5 *et seq.*

Bureau, and on August 1, 1922, it filed its Rule Book in the office of the commissioner of insurance. The commissioner of insurance proceeded to consider the Rule Book item by item. The situation is best presented by a statement made by the commissioner of insurance in his opinion, as follows:

"In order to carry out the provisions of the statutes, it is necessary for the commissioner of insurance to determine as to whether or not the rates, rules and regulations promulgated by the various rating bureaus are reasonable and nondiscriminatory. The 'Rule Book,' which is the subject of this order, has always been considered by the insurance department and the insurance companies as a necessary and important part of the rating system, through the use of which the rating and re-rating of risks in a reasonable and non-discriminatory manner may be accomplished.

"The 'Rule Book' has been the storm center of controversy ever since chapter 61 of the Laws of 1917 was enacted. Numerous rule books have been filed by the Wisconsin Inspection Bureau, all of which have been disapproved by the department.

"The matter has been the subject of numerous negotiations, and innumerable conferences have been held with representatives of the companies concerned during the past five years. The department has, at various times, withdrawn its disapproval of the filed 'Rule Book' to determine whether or not a proper enforcement of its provisions could be had. The rates, rules and regulations contained therein were at such variance with past practice and custom that the attempt at enforcement always resulted in an avalanche of complaints to the department. We realized that some past practices and customs must be discontinued as they were discriminatory but there was merit in the majority of the complaints.

"Before a proper administration of the rating law can be had, this matter must be definitely settled. It has been in dispute too long. The department has given the matter special attention during the past eighteen months. The representatives of the insurance companies have been advised of the attitude of the department, but an examination of the 'Rule Book' as filed discloses the fact that it contains rules

and regulations which have been repeatedly disapproved by myself and by my predecessor. The companies are apparently assuming the attitude of forcing certain underwriting rules and practices notwithstanding such disapproval.

"It may be well at this time to state that any attempt on the part of the Audit Bureau to enforce rules that have been disapproved will meet with drastic action.

"The different rules, rates, regulations and riders will be considered in consecutive order as filed, and our approval or disapproval given as the case may be."

To make the matter concrete, the form of acetylene gas provided:

"Subject to the following conditions, permission is granted, when not in violation of any law or statute of the state, to generate and use acetylene gas to light the premises described in this policy."

The commissioner disapproved the form which contained these words and said: "A permit with the following eliminations would be approved: (1) When not in violation of any law or statute of the state. (2). Item 1 of the conditions," which was as follows:

"1. That the charging of the generator shall be done by daylight or incandescent electric light only, and that there shall be no other artificial light, and no fire or blaze in the room where and when such generator is being filled or emptied, or open."

The Rule Book contains seventy-three pages. The commissioner considered each proposed rule, form, rider, and privilege and approved or disapproved the same in his discretion. In determining whether or not this broad power was conferred by the act upon the commissioner, some attention must be given to the field in which the law was designed to operate. In 1897 the legislature adopted a so-called anti-compact statute (now sec. 203.23). By this act it was provided that all insurance companies were prohibited from com-

bining for the purpose of establishing and maintaining a fixed schedule of rates. As originally enacted it authorized local boards of underwriters to establish rates for their respective localities. Under the 1897 law, state supervision over rate-making was very difficult and necessarily inadequate. The commissioner could not supervise the rate-making activities of innumerable local boards. As a result there was a wide diversity in both rates and forms even in communities where local boards were established. The rating act of 1917, the law here under consideration, was designed to set up a new plan which would make state supervision of rate-making more efficient and attainable. The title of the act was "An act to amend section 1943$b$ of the statutes, relating to boards of underwriters, and to create sections 1946—1 to 1946—18, inclusive, of the statutes, relating to fire insurance rate-making, prohibiting discrimination, and providing a penalty."

The general scheme of the law may be stated as follows: Every company writing the designated kind of insurance is required to be a member of a rating bureau. A rating bureau may be formed by any five or more companies and each bureau is required to admit applying companies to membership. Subject to certain supervisory powers of the commissioner, each bureau was charged with the management of its own affairs and was required to be licensed. Rates were to be established by the bureau, and no company could establish a different rate except in the manner provided by the act (sec. 203.40). All rates were required to be reasonable. In order to prevent discrimination in rates through difference in contract rights or privileges, a rider which permits an increase of hazard not contemplated in the bureau rate for any risk, is required to be charged for at a rate fixed by the bureau; and no rider affecting the hazard for which no charge is to be made may be used until filed and approved by the commissioner (sec. 203.46). To provide a check upon

the operations of the various member companies and their agents, a stamping office was provided for. The act recognized the long established practice of insurance companies in the classification of risks and the determination of rates applicable by base rates, and the continuance of these practices was authorized. The commissioner was authorized to review any rate "for the purpose of determining whether the same is unreasonable or discriminatory."

By authorizing the bureau or bureaus, as the case may be, to prepare deviations from the standard policy form and requiring the constituent companies to use the forms or riders so prepared, or in case of deviation to bring the fact immediately to the attention of the bureau, uniformity of practice was secured as to the members of each bureau. This enabled the commissioner to correct irregularities in practice and required the companies themselves to provide the machinery by which the irregularities were to be disclosed. Any construction of the law must take into account the fact that it was to be applied to the existing conditions which had grown up through long years of practice, which it was the intention or purpose of the state to disturb only so far as it was necessary to secure uniform practice and prevent discrimination in rates and the exaction of unlawful or unreasonable rates. Manifestly the provisions of the riders as prepared by the bureaus would necessarily affect the contractual liability of the companies issuing policies thereunder. They operated in a very limited field and dealt mainly with the coverage to be given in each class of cases. In actual practice it is difficult if not impossible to prescribe forms which fit every case and there was a continuing necessity for amendment, rewriting and readjustment of the rider form. This flexibility in rider form is secured by the provision that when once filed it shall be in force until disapproved by the commissioner of insurance. The argument that "all regulations or rules of any such rating bureau"

refer only to matters affecting its internal management is completely refuted by the provisions of sub. (2) of sec. 203.36, which provides: "No regulation or rule shall be adopted which shall limit or prohibit the exercise, by any company, of its right to make a different rate, as provided in section 203.40."

Manifestly the regulation or rule referred to in sub. (2) is one which applies to member companies in their relations with the insured. It has no application whatever to the internal affairs of the bureau. As a matter of practice, a very large proportion of the companies engaging in the fire insurance business in Wisconsin are organized and known as the Wisconsin Inspection Bureau. The book containing the rider forms prepared by this bureau is described as "Rule Book: Rules, Charges and Credits, Terms, Privileges, Riders, Forms and Conditions Affecting the Cost of Fire, Lightning and Windstorm Insurance in Wisconsin." The book is filled with provisions embodied in the various riders which are certainly regulations and rules under any reasonable interpretation of these terms. Take for instance the form relating to gasoline storage:

"*Gasoline storage.* In all cases where permission is granted for the keeping or use of gasoline, in dwellings, private boarding and rooming houses, nurses' and sisters' homes, chapter, fraternity and sorority houses, flats, terraces, tenements and apartment houses, private barns and garages and outbuildings used in connection therewith, the following form must be used:

"*Gasoline permit* (To keep or use). Subject to the following conditions, permission is granted, when not in violation of any law or statute of the state, to keep and use in the premises described in this policy, not to exceed . . . gallons of gasoline.

"The conditions of this permit, in so far as they are within control of the assured, are as follows: 1. That the gasoline shall be kept in a tight and entirely closed metal can,

free from leak.   2. That the filling, emptying or opening of any can or receptacle containing gasoline shall be done by daylight or incandescent electric light only, and that there shall be no other artificial light, and no fire or blaze in the room where and when such can or receptacle is being filled or emptied, or open.   3. The term 'gasoline' shall be held to include naphtha, benzine, or any of the light products of petroleum, coal or tar, by whatever name known.

"Note:  The term 'premises,' as used in this permit, means only the building (or buildings) described in this policy, or such portions of same as are occupied by the assured.

"Caution:  Gasoline should be kept outside the building described in this policy, under ground, or at least thirty (30) feet therefrom.

"Attached to, etc.

"Note:  The attachment of this permit does not waive any schedule charge therefor."

The first clause provides a rule by which the agent issuing the policy may determine to what particular class or classes of buildings it is applicable, and where applicable it "must be used."   Then follow the rules, which are termed conditions, under which the gasoline may be stored upon the premises of the designated classes.   The term "gasoline" is defined, the term "premises" is defined, the insured is cautioned and directed to do certain things.   While the definition of the word "gasoline" is included in the conditions, the definition of the word "premises" is part of the cautionary matter and apparently not a part of the conditions.   How it can be said that these are not regulations or rules of the rating bureau issuing them is very difficult to understand.

The mere fact that the term "rider" is not used is not very significant when the term is sixth in the enumeration of the matters which are provided for in the Rule Book issued by the bureau itself.

As already indicated, each insurance company is required to be a member of a bureau.   It is obliged to comply with the

rules and regulations issued by the bureau and therefore can use in a particular case only that form or rider issued by the bureau which is applicable to the situation. If the construction contended for by the plaintiffs is given to the act, then neither the insured nor the commissioner of insurance nor any one representing the insured has any voice as to the terms of the riders except the bureau. The statute took from the local boards of underwriters the rule-making power and vested it initially in the bureaus for the purpose of securing uniformity. The insured might confer with a local board. As a practical matter he cannot confer with the bureau. If the plaintiffs' construction of the statute is adopted, he must then accept insurance upon the terms prescribed by the bureau or decline it altogether. In order that this situation should not place the bureau in a place where it might arbitrarily work hardship to the insuring public, the power to disapprove the proposed rules and regulations was lodged with the commissioner of insurance as the representative of the insured. Considering the problem to be solved, that is, to devise a system which would produce uniformity of contract in accordance with the declared purpose of the standard policy law and reasonableness of rates and a workable administration of the law, every consideration requires that the law be construed as conferring upon the commissioner power to disapprove the rules and regulations filed with him by the bureaus. Otherwise, the way is open for the insured to become the victim of the abuses which the standard fire policy law was enacted to suppress.[1]

This brings us to the second and perhaps the most difficult and perplexing question presented by the record. It is argued on behalf of the plaintiffs that if the act be so construed as to confer power upon the commissioner of insur-

---

[1] *Bourgeois v. Northwestern Nat. Ins. Co.* 86 Wis. 606, 57 N. W. 347.

ance to disapprove rules and regulations filed with him by a bureau, he can do what he did do in this case, viz. not only disapprove the form filed by the bureau, but indicate what kind of a form he will approve, as already indicated in the instance of the acetylene gas form hereinbefore set out. It is argued, and we think correctly, that if he has this power he has in practical effect the power to prescribe the rules and regulations merely by way of disapproving them until the regulations and rules filed meet his notion of what the rules and regulations should be. It is considered that this is a fair, natural, and reasonable consequence, and that the validity of the statute must be considered and determined as so construed. The validity of the statute so construed is challenged upon two grounds: first, that it constitutes an unlawful delegation of legislative power; second, that if it is held to be a delegation of legislative power, the statute erects no standard in accordance with which the discretion of the commissioner of insurance is to be exercised and vests in him an arbitrary power.

A determination of the question raised involves a fundamental question of law. If we apply literally the doctrine announced in *Dowling v. Lancashire Ins. Co.* (1896) 92 Wis. 63, 65 N. W. 738, we will arrive at one conclusion. If the doctrine there announced is to be limited or the case in whole or in part overruled, we shall arrive at a different determination.

This has led us to a re-examination of the decisions of this court relating to the delegation of legislative power so called and to a study of the development of administrative law not only in this state but in other jurisdictions.

Writing in 1885, A. V. Dicey said:

"The term *droit administratif* is one for which English legal phraseology supplies no proper equivalent. The words 'administrative law,' which are its most natural rendering,

are unknown to English judges and counsel, and are in themselves hardly intelligible without further explanation." [1]

Speaking of the effort to establish a strong administrative system in England, he said:

"The attempt ended in failure, partly because of the personal deficiencies of the Stuarts, but chiefly because the whole scheme of administrative law was opposed to those habits of equality before the law which had long been essential characteristics of English institutions." [2]

Thirty years, however, worked a complete change in Dicey's notions of administrative law. Writing in 1915, he said:

"The objection to bestowing upon the government of the day, or upon the servants of the crown who come within the control or the influence of the cabinet, functions which in their nature belong to the law courts, is obvious. Such transference of authority saps the foundation of that rule of law which has been for generations a leading feature of the English constitution. But we must remember that when the state undertakes the management of business properly so called, and business which hitherto has been carried on by each individual citizen simply with a view to his own interest, the government, or, in the language of English law, the servants of the crown, will be found to need that freedom of action necessarily possessed by every private person in the management of his own personal concerns." [3]

The *Arlidge Case* [4] marks a turning point in the history of English law. In that case it was held that judicial power could be delegated to an administrative body; that it might be exercised in accordance with rules made by the administrative body and need not be exercised according to the

---

[1] The Law of the Constitution, Dicey, p. 323.

[2] Same, p. 349.

[3] The Development of the Administrative Law in England, Dicey, 31 Law Quarterly Review, pp. 148, 150.

[4] *Local Government Board v. Arlidge* (1915) A. C. 120, 84 L. J. K. B. 72.

course of the common law. That case will stand with *Rylands v. Fletcher, Hadley v. Baxendale,* and other cases, perhaps not so great intrinsically, but highly significant because they are landmarks in the development of the law. Not only in English-speaking countries but throughout the world where efficient highly organized government is maintained, in recent years governments have undertaken to do many things with which they had not previously attempted to deal,—at least not in the same way. Everywhere this increase in the functions of government has led to the creation of new governmental agencies.

In this country the development of administrative law met an almost insuperable obstacle in the doctrine of the separation of powers. This doctrine announced by Aristotle, expounded by Locke and Montesquieu, found its most explicit statement in the constitution of Massachusetts, where it is said:

"In the government of this commonwealth the legislative department shall never exercise the executive and judicial powers or either of them; the executive shall never exercise the legislative and judicial powers or either of them; the judicial shall never exercise the legislative and executive powers or either of them; to the end it may be a government of laws and not of men."

In England and on the Continent the idea of a separation of powers has remained a matter of political theory. In this country it was incorporated into our constitutions—state and national—and became a matter of law.

Beginning with the creation of the Interstate Commerce Commission, which in the beginning was little more than an extra-legislative committee, there has been a development in our law brought about chiefly by the creation of boards, bureaus, and commissions, which has worked and is working a fundamental change. Not only are legislative and judicial

powers delegated, but they are exercised in combination, and we not infrequently find powers belonging to the three coordinate branches of government combined in a single administrative agency. The change is fundamental because the law, at least in some of its aspects, no longer emanates from the legislature, is no longer wholly declared and enforced by the courts; and to the extent that this is true, we have departed from the fundamental principles upon which our political institutions rest. This has been the cause of much concern and is a source of much diversity of opinion.

On April 17, 1928, addressing the Daughters of the American Revolution, the President said:

"Through regulations and commissions we have given the most arbitrary authority over our actions and our property into the hands of a few men. Some of this has been necessary to prevent those who are weak from being overcome by those who are strong. But it is a procedure fraught with considerable danger and should only be adopted as a last resort." [1]

There was no place for administrative agencies in the constitutional system of this country. They were not only unknown but undreamed of at the time the constitution of the United States was formed as well as at the time most state constitutions were adopted. Administrative law has been compelled to crowd its way into our legal system and as a consequence has not been very hospitably received. The whole matter has been considered and reconsidered not only in the decisions of courts but the matter has been exhaustively investigated by legal writers.[2]

Recently various aspects of administrative law have been

[1] See, also, Drifting Sands of Party Politics, Oscar W. Underwood, p. 120 et seq.
[2] See Separation of Powers—Administrative Exercise of Legislative and Judicial Power, beginning 27 Pol. Science Quart. p. 215 (1912); Principles of Administrative Law of the United States, Goodnow; The Evolution of Government by Commissions and the

exhaustively considered in three notable works.[1]    In 1916
Elihu Root said:

"As any community passes from simple to complex con-
ditions, the only way in which government can deal with the
increased burdens thrown upon it is by the delegation of
power to be exercised in detail by subordinate agents, sub-
ject to the control of general directions prescribed by su-
perior authority.   The necessities of our situation have al-
ready led to an extended employment of that method. . . .
Yet the powers that are committed to these regulating agen-
cies, and which they must have to do their work, carry with
them great and dangerous opportunities of oppression and
wrong. . . . A system of administrative law must be devel-
oped, and that with us is still in its infancy, crude and im-
perfect." [2]

Manifestly if all the powers of government were included
within the three co-ordinate departments enumerated in the
constitution and there could be no delegation nor cross-
delegation of these powers, there was no room in the consti-
tutional system for the development of administrative agen-
cies.   Not only in the matter quoted from the President and
Mr. Root, but in practically every discussion of the subject
by those opposed to the extension of the power of adminis-
trative agencies, the necessity for the creation of such agen-
cies is frankly admitted.   Courts have recognized the situ-
ation, and under one pretext or another have upheld laws in

Decline of the Judiciary, 49 Chicago Legal News (1916), p. 190;
American Administrative Law, Freund *et al.* (1923); Address of
William D. Guthrey, 46 N. Y. State Bar Asso. Reports (1923);
Growth of Administrative Justice, Pound, 2 Wis. Law Review,
321; Address of President Root, 41 Bar Asso. Reports (1916);
Quasi-Judicial and Quasi-Legislative Powers in Wisconsin, Ray A.
Brown, 3 Wis. Law Review, 385 (1926).

[1] Administrative Justice and Supremacy of Law in the United
States, Dickinson; Administrative Powers Over Persons and Prop-
erty, Freund (1928); Insurance Commissioner of the United States,
Patterson (1926).

[2] American Bar Asso. Reports (1916), Address of the President,
Elihu Root, pp. 368, 369.

recent years that undeniably would have been held unconstitutional under conditions which existed prior to the Civil War.

The latest authoritative declaration upon this subject is found in *Hampton v. U. S. 72* Lawy. Ed. Adv. Op. No. 10, p. 448, 48 Sup. Ct. 348, where it is said:

"The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations."

If an executive or administrative officer has authority either by himself or acting with other officers to do the very thing that Congress might have done in the exercise of its legislative power, that is, make a rule of conduct for which a citizen may be penalized if he disobeys it, it is difficult to see how it can be said that the power exercised is in one case legislative and in the other case it is not. The regulation made by the administrative officers answers every definition of law. The regulation prescribes a rule of future conduct, compliance with which may be enforced in a court of law. An act of Congress can do no more, and if in the making of the rules, as is held in the *Hampton Case, supra,* the administrative officer may be vested with a discretion as to what the regulation shall be, then the two acts become identical. To call one legislative power and the other a power to make rules and regulations does not change the substance of the power exercised in each case. What it seems to us is demonstrated by the discussion in the *Hampton Case,* where the entire matter is thoroughly reviewed, is that there never was and never can be such a thing in the practical administration of the law as a complete, absolute, scientific separation of the so-called co-ordinate governmental powers. As a matter of

fact they are and always have been overlapping. Courts make rules of procedure which in many instances at least might be prescribed by the legislature. When courts through a receiver reach out and administer a great railway system extending from one ocean to the other, they are not exercising a strictly judicial power,—they are exercising an administrative or executive power, which historically has found its way into the judicial department. The constitution reserves to the legislature the power to act as a court in certain cases. When it acts as such it exercises a judicial power. Every executive officer in the execution of the law must of necessity interpret it in order to find out what it is he is required to do. While his interpretation is not final, yet in the vast majority of cases it is the only interpretation placed upon it, and as long as it is acquiesced in it becomes the official interpretation which the courts heed and in which they oftentimes acquiesce as a practical construction.

The power of making rates for public utilities is sustained upon the theory that it is a fact-finding operation; that there is one just and reasonable rate, and that it is the duty of the administrative agencies to discover that as a matter of fact, and that therefore in fixing the rate the administrative agency does not do so in the exercise of legislative power although it does the exact thing which the legislature itself might do. If, when the legislature does it, it is an exercise of legislative power, then it must be the exercise of legislative power when the Interstate Commerce Commission does it unless it be true that men gather "thistles from fig trees." As a matter of fact, a rate fixed by an utility commission cannot be disturbed by the courts unless it is so low as to be confiscatory or possibly so high as to be extortionate and oppressive. Manifestly the difference between the lowest rate and the highest rate which the utility commission may lawfully fix is not correctly represented by a line but by a zone. If the commission in the exercise of

its discretion fixes a rate within that zone, its determination may not be disturbed. Consequently, there is more than one rate which can be lawfully established by the commission in the exercise of delegated power, and the zone within which the utility commission may operate has exactly the same breadth as that within which the legislature itself might act without judicial interference. In the beginning it was often said that administrative bodies could not be given power to exercise discretion. If that were true, then the activities of an administrative agency would be as circumscribed and inflexible as an act of the legislature. They can be and are in fact endowed with discretionary powers, but the field within which those powers are to be exercised is prescribed.

The essential facts upon which courts, legislatures, and executives, as well as students of the law, agree is that there is an overpowering necessity for a modification of the doctrine of separation and non-delegation of powers of government. In the face of that necessity courts have upheld laws granting legislative power under the guise of the power to make rules and regulations; have upheld laws delegating judicial power under the guise of power to find facts. As Mr. Root said:

"The old doctrine prohibiting the delegation of legislative power has virtually retired from the field and given up the fight. There will be no withdrawal from these experiments. We shall go on; we shall expand them, whether we approve theoretically or not, because such agencies furnish protection to rights and obstacles to wrong doing which under our new social and industrial conditions cannot be practically accomplished by the old and simple procedure of legislatures and courts as in the last generation."

The public interest would be greatly advanced and our law clarified if the situation as it exists were frankly recognized and an attempt made by all departments of the government to guard against the dangers foreseen by Montesquieu and apprehended by every thoughtful student of the subject.

For there can be no doubt that in sustaining laws which combine legislative and judicial power in a single administrative agency, we are on the way back to where we were when the doctrine of the separation of powers was enunciated as a political theory and before it had been wrought into our constitutional system. A refusal to recognize the facts as they exist and to give administrative law its rightful place in our legal theory has prevented a logical and symmetrical development of that law. A legislative act first appears as a bill, is read the first and second time, referred to a committee where it is the subject of a hearing, reported back, read a third time and is subject to further debate; if passed it is then considered by the other house, and if concurred in must be approved by the executive. A proposed rule of an administrative body under the present law is not made the subject of a hearing, but may be evolved by the administrative agency without consultation, without debate, and may be announced in the most unexpected way. It should be said that administrative practice at least in this state is far ahead of the requirements of our administrative law in that at least in many instances hearings are held, matters are made subjects of debate by interested parties, and the process by which the rule is formulated in all essential particulars follows that of a bill in the legislature although of course the form of procedure is entirely different. No doubt one reason why hearings have not been required is that the legislature is in constant fear that if a law requires such procedure, that fact will be seized upon as proof of the delegation of a discretionary power and the whole law held unconstitutional. While in the exercise of its fact-finding powers most administrative agencies follow substantially the procedure of courts, they are in many instances not required to do so. There has been a persistent effort to make their findings conclusive and not subject to review, and no doubt the whole field of administrative law has had an asymmetrical

development because of the fact that it had no recognized place in our constitutional theory although it has of necessity been accorded a place in our law. It may well be that the nomenclature of the decisions should be retained and that that kind of legislative power which may be delegated should be called the power to make rules and regulations, and that that kind of judicial power which may be delegated should be called the power to find facts, although the true significance of these terms should be better understood.

In the light of these general observations we shall proceed to an examination of the law of this state. In 1863, having under consideration the draft law, this court quoted with approval the following language by Chief Justice MARSHALL from *Wayman v. Southard,* 10 Wheat. 1 (p. 42) :

"The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details. . . .

"The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law; but the maker of the law may commit something to the discretion of the other departments, and the precise boundary of this power is a subject of delicate and difficult inquiry, into which a court will not enter unnecessarily." [1]

From that time to this it has been held that the legislature might make a general provision and give powers to those who are to act under such general provision to fill up the details. If the principle thus enunciated had been given due weight, the course of the law's development would undoubtedly have been quite different.

In 1891 the legislature enacted the standard policy law.

---

[1] *In re Griner,* 16 Wis. 447, at 461.

The act authorized the commissioner of insurance "to prepare, approve and adopt a printed form in blank of a contract or policy of fire insurance, together with such provisions, agreements, or conditions as may be indorsed thereon or added thereto and form a part of such policy and contract, and such form shall, as near as the same can be made applicable, conform to the type and form of the New York standard fire insurance policy."

This was challenged as an unconstitutional delegation of legislative power. The court quoted with approval the language of RANNEY, J., in *Cincinnati, W. & Z. R. Co. v. Clinton Co. Comm'rs,* 1 Ohio St. 77, 88, now quoted with approval in *Hampton v. U. S., supra,* as follows:

"The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. To the latter no valid objection can be made."

Applying this rule, the court reached the conclusion that the power conferred upon the commissioner of insurance was an unlawful delegation of legislative power. *Dowling v. Lancashire Ins. Co.* (1896) 92 Wis. 63, 65 N. W. 738.

It is worthy of note that in *Hampton v. U. S., supra,* the supreme court, applying the same rule, reached the conclusion that the law vesting in the President the power to fix import duties was not an unconstitutional delegation of legislative power. In the *Hampton Case* the court said:

"In carrying out that constitutional division into three branches it is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President, or to the judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not co-ordinate parts of one government

and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. *In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination."* (Italics ours.)

This decision lays down the means by which the boundaries of the power which Chief Justice MARSHALL said was a subject of delicate and difficult inquiry are to be determined. The boundaries are to be determined according to common sense *and the inherent necessities of governmental co-ordination.*

The subject of what constitutes an unconstitutional delegation of legislative power has been under consideration by this court many times since *Dowling v. Lancashire Ins. Co., supra.*[1]

In *State ex rel. Buell v. Frear* (1911), 146 Wis. 291, 131 N. W. 832, a law conferring upon the civil service commission certain powers was under consideration, and it was claimed that the power conferred by the act to prescribe and amend rules, put rules into effect, classify offices and places of employment, giving to the commission power to determine what classes shall be subject to examination,

---

[1] *State ex rel. Adams v. Burdge* (1897), 95 Wis. 390, 70 N. W. 347; *Adams v. Beloit* (1900), 105 Wis. 363, 81 N. W. 869; *State ex rel. Boycott v. La Crosse* (1900), 107 Wis. 654, 84 N. W. 242; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* (1908), 136 Wis. 146, 116 N. W. 905; *State ex rel. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* (1908), 137 Wis. 80, 117 N. W. 846; *State ex rel. Van Alstine v. Frear* (1910), 142 Wis. 320, 125 N. W. 961; *State ex rel. Buell v. Frear* (1911), 146 Wis. 291, 131 N. W. 832; *State ex rel. Mueller v. Thompson* (1912), 149 Wis. 488, 137 N. W. 20; *State ex rel. Carey v. Ballard* (1914), 158 Wis. 251, 148 N. W. 1090; *State ex rel. Nehrbass v. Harper* (1916), 162 Wis. 589, 156 N. W. 941; *State v. Lange Canning Co.* (1916), 164 Wis. 228, 157 N. W. 777, 160 N. W. 57; *Klein v. Barry* (1923), 182 Wis. 255, 196 N. W. 457.

make certain exemptions, authorizing the commission to suspend the provision requiring examinations in certain cases, was an unconstitutional delegation of legislative power. Speaking of these provisions the court said:

"No provision of the act, directly or by implication, authorizes any rule to be made that can add to or in any way alter or amend the regulations made by the law. Only such rules are authorized as serve to provide the details for the execution of the provisions of the law in its actual administration, to fix the way in which the requirements of the statute are to be met, and to secure obedience to its mandates."

If this principle had been applied in the *Dowling Case,* *supra,* it must have resulted in a judgment upholding the constitutionality of the standard policy law. In that case a standard was prescribed—the policy form of the state of New York. The adaptation of that form to the needs of Wisconsin was certainly doing no more than to carry out the declared legislative purpose. There could have been no wide departure from the prescribed legislative standard. There are now many laws upon our statute books which confer powers as broad or broader than those conferred upon the civil service commission.[1]

The most notable of these laws is the one conferring power upon the industrial commission with respect to safe

---

[1] Sec. 140.05, powers and duties of the board of health.

Ch. 143, relating to communicable diseases.

Sec. 144.03, power of the state board of health with reference to water, ice, sewage, and refuse.

Ch. 145, relating to power of state board of health to supervise plumbing.

Ch. 140, relating to power of state board of health with respect to hotels and restaurants.

· Numerous statutes relating to qualification of professional groups, such as lawyers, physicians, dentists.

Laws supervising and regulating occupations and trades, such as licensing of barbers, plumbers, beauty parlor operators, embalmers, and other like laws.

places of employment. Every employer is required to furnish a safe place of employment (sec. 101.06). The industrial commission is authorized—sec. 101.10 (3)—to investigate, declare, and prescribe what safety devices, safeguards, or other means or method of protection are best adapted to render employees of every employment and place of employment and frequenters of every place of employment safe and to protect their welfare as required by law or lawful orders, etc. (4) To ascertain and fix such reasonable standards and to prescribe, modify, and enforce such reasonable orders for the adoption of safety devices, safeguards, and other means or methods of protection to be as nearly uniform as possible, as may be necessary to carry out all lawful orders with respect to the protection of the health, safety, and welfare of employees, etc.

Pursuant to the power conferred on it, the industrial commission has promulgated so-called general orders dealing with safety in construction and general orders on safety. The validity of these orders has been sustained, and, where they have been violated, employers have been obliged to pay under the workmen's compensation law as a penalty fifteen per cent. in addition to the normal compensation. These general orders prescribe the manner in which construction work shall be carried on, how scaffolds shall be built, what barriers and guards shall be erected, and a multitude of matters of like character. Here is a field in which the necessity of an administrative agency is apparent to the most superficial observer. While the legislature might by act prescribe the same rules as are prescribed by the industrial commission, when prescribed they would remain rigid, inflexible, subject to alteration only by amendment by subsequent legislatures.

The power which can be exercised by the commissioner of insurance under the provisions of the rating law, compared with the whole volume of power exercised by other

administrative agencies in this state, is insignificant. It is manifest that it is the substance of the power delegated rather than the number of acts which may be performed pursuant to it that should determine whether it falls within or without the field of power which may be delegated. We are unable to discover any substantial difference in the character of the power exercised by the commissioner of insurance in the disapproval of rules and regulations proposed by the bureau and filed by it in his office and the power to prescribe methods by which employers are to make places of employment reasonably safe. While *Dowling v. Lancashire Ins. Co., supra,* has not in terms been overruled, it has been undermined by subsequent decisions and its foundations removed. Certainly if we are to have any regard for prior decisions or for "common sense and the inherent necessity of governmental co-ordination," we cannot hold the power conferred upon the commissioner of insurance by sec. 203.36 an unconstitutional delegation of legislative power.

It is considered that the constitutional aspects of administrative law have been so far developed by statute and decision as to indicate in a general way the line which separates that kind of legislative power which may not be delegated from that kind which may be delegated. The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,—is a power which is vested by our constitutions in the legislature and may not be delegated. When, however, the legislature has laid down these fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose, in the language of Chief Justice MARSHALL "to fill up the details;" in the language of Chief Justice TAFT "to make public regulations interpreting the

statute and directing the details of its execution." It is legislative power of the latter kind which is oftentimes called the rule-making power of boards, bureaus, and commissions.

It only leads to confusion and error to say that the power to fill up the details and promulgate rules and regulations is not legislative power. Chief Justice MARSHALL indicated the basis upon which controversies in this field should be determined when he indicated that there are two sorts of legislative power—one of which may be delegated and one of which may not. If this distinction is not recognized and it is held that there can be no delegation of legislative power, it logically follows that the rules and regulations of administrative bodies cannot be given the force and effect of law, as was recently held by the court of appeals in the state of New York.[1]

If the principle of that decision is adhered to, it follows that the power of administrative agencies to fill up the details and to make rules and regulations amounts to little more than the power to give advice. An inflexible application of that doctrine creates a situation which can only be met by a constitutional amendment. The supreme court of the United States as well as the courts of last resort of many states have long since held that the rules and regulations of administrative bodies may be given the effect of law by legislative declaration to that end.[2] The act under consideration in the *Hampton Case* authorized the President to fix the rate of import duties. He was not invested with the power to say whether or not there should be a duty. Congress said that. Congress established a standard by which the amount of the duty to be imposed was to be determined, declared the end to be achieved, and delegated

---

[1] *Schumer v. Caplin,* 241 N. Y. 346, 150 N. E. 139.
[2] Freund, Administrative Power Over Persons and Things, p. 145 *et seq.*

to the President the power to determine within the limits prescribed the exact rate which should be levied in order to achieve the legislative purpose. It is idle and contrary to the fact to say that it delegated to the President no discretion. It was because no rigid rule could be adopted and it was manifestly necessary to exercise a discretion from time to time in accordance with the facts as they existed at the time the discretion was exercised, that Congress found it necessary to delegate the power at all.

So in the instant case the general purpose to be achieved by uniformity of rules and regulations proposed by rate-making bureaus is indicated and the power of the commissioner of insurance is limited to disapproving those which in his judgment would not further the legislative purpose or run counter to it. This power the legislature might properly delegate to the commissioner of insurance.

We are not called upon here to deal with the matter of delegation of judicial power. The delegation of judicial power is subject to certain other constitutional limitations embodied in the Fourteenth amendment and will be best disposed of when a case involving the question is presented and fully argued.[1]

In this connection, however, we feel that we should respond to the suggestions made in responsible quarters that the delegation of power to subordinate administrative agencies is fraught with danger for the reason that it introduces into our system a governmental agency which may exercise some of the powers of each of the co-ordinate departments of government in combination.

As was pointed out by Mr. Dicey,[2] there will remain two checks upon the abuse of power by administrative agencies.

---

[1] See *Ohio Valley Water Co. v. Ben Avon Borough*, 253 U. S. 287, 40 Sup. Ct. 527.

[2] Development of Administrative Law in England, 31 Law Quarterly Review, p. 151.

In the first place, every such agency must conform precisely to the statute which grants the power; secondly, such delegated powers must be exercised in a spirit of judicial fairness and equity and not oppressively and unreasonably.

The doors of the courts of this country will always stand open to any citizen complaining that he has been deprived of his constitutional rights, no matter under what form of law the deprivation has been worked. The emergence of administrative agencies will not impair or destroy the checks and balances of the constitution. To these two may be added a third check—one which seems to us is frequently overlooked,—and that is that all of these administrative agencies are the creatures of the legislature and are responsible to it. Consequently the legislature may withdraw powers which have been granted, prescribe the procedure through which granted powers are to be exercised, and if necessary wipe out the agency entirely.

For these and other reasons it seems much wiser to permit administrative law to develop in our constitutional system slowly and in an orderly way rather than to attempt to achieve it at a single bound by constitutional amendment.

It is further urged that if the statute be held constitutional as conferring upon the commissioner of insurance the power to disapprove rules and regulations proposed by a rating bureau, it prescribes no standard in accordance with which the commissioner of insurance must act. Considering the nature of the subject matter dealt with, it is quite apparent that any attempt on the part of the legislature to prescribe a standard would result in effect in a prescription of the rules and regulations themselves,—in other words, the subject matter does not admit of the application of any except the most general standards. A Michigan statute had the following prescribed standards: (1st) fairness and equity between insurer and insured; (2d) brevity and simplicity; (3d) the avoidance of technical words and phrases;

(4th) the avoidance of conditions the violation of which by the insured would, without being prejudicial to the insurer, render the policy void or voidable at the option of the insurer; (5th) the use of as large and fair type as is consistent and convenient with the paper or parchment; (6th) placing of each separate condition in paragraphs and the numbering of paragraphs. This law, however, was held unconstitutional.[1]

While the statute does not in terms provide that the commissioner of insurance shall exercise a sound and reasonable discretion in the disapproval of proposed rules and regulations, that condition is necessarily implied. As has been said many times, in many cases administrative officers or bodies must act not only within the field of their statutory powers but in a reasonable and orderly manner. There is nothing in the action of the commissioner of insurance in this case that indicates that he places any other construction upon the act or that he supposes that there is vested in him an arbitrary and uncontrolled power. The rule of reasonableness inheres in every law, and the action of those charged with its enforcement must in the nature of things be subject to the test of reasonableness.[2]

In determining whether or not the power granted by legislative act in a particular case to an administrative agency is of the kind which may be delegated, due regard must be paid to the nature of the subject matter with which the act deals. The powers conferred upon the railroad commission of this state to deal with public utilities are definitely limited, modes of procedure prescribed, and the legislative intent and purpose clearly indicated. The laws of this state conferring upon the industrial commission power to make safety

---

[1] *King v. Concordia Fire Ins. Co.* (1905), 140 Mich. 258, 103 N. W. 616.

[2] *Standard Oil Co. v. U. S.* 221 U. S. 1, 31 Sup. Ct. 502; *U. S. v. American Tobacco Co.* 221 U. S. 106, 31 Sup. Ct. 632; *Kansas City S. R. Co. v. U. S.* 231 U. S. 423, 34 Sup. Ct. 125.

orders, and the act conferring upon the railroad commission power to administer so-called "blue sky laws," are granted in the most general terms because the nature of the subject matter does not permit of a more precise delimitation. No useful purpose would be achieved, nor would the law in fact have any different meaning or application, if every kind of a place of employment imaginable were specified in the act and the industrial commission authorized to promulgate the necessary rules and regulations to make the places of employment specified safe. It would come to the same thing in the end. It would be practically impossible for the legislature to prescribe definite standards to meet the varying situations which arise in the administration of the Securities Act. It can only indicate in general terms the legislative policy to be achieved and the methods by which the railroad commission is to work out the declared policy. As already indicated, an attempt to specify a standard for rules and regulations to be promulgated by rating bureaus and approved by the commissioner of insurance would be nothing more nor less than the prescribing of the rules and regulations and riders themselves. If this were done by legislative enactment, the flexibility in practice necessary to meet changing conditions in the business world would be destroyed. The general purpose of the law is indicated. The commissioner of insurance must act within the boundaries of reason and not oppressively. Therefore, the standard prescribed, considering the subject matter dealt with, meets the test already indicated.

By ch. 469 of the Laws of 1921, the standard fire policy law was amended as follows:

"Nothing in this section shall be construed as prohibiting the attachment to said policy of a clause or agreement insuring against consequential loss or damage, including loss of rents, leasehold interests, profits or commission or loss resulting from interruption of business or manufacture due to fire."

It is argued that this amendment brings the subject of insurance against consequential loss or damage within the act and consequently within the provisions of the rating law.

Sec. 203.32 provides: "Every company or other insurer licensed to effect insurance against the risk of loss or damage by fire, lightning, windstorm, . . . shall be a member of a rating bureau."

It is considered that the legislature did not by the enactment of ch. 469 of the Laws of 1921 intend to make the matter of insurance against indirect or consequential damages subject to the provisions of ch. 203. It merely provided that riders covering that field of liability might be attached to the standard fire policy. Liability of the kind insured against under these policies is not covered by insurance against loss by fire, lightning, or windstorm, hence the amendment. If it had been the intention of the legislature to make insurance of this kind subject to the provisions of ch. 203, it would have undoubtedly used unmistakable language to that effect. The mere fact that insurance of this sort may be made effective by a rider attached to the standard fire policy does not subject it to the provisions of ch. 203.

We now pass to a consideration of the rates established by the order of the commissioner of insurance. Sec. 203.42 confers upon the commissioner power, "upon the written complaint of any person having a direct financial interest, or upon his own motion, to review any rate fixed by a bureau or insurer for insurance upon any risk or classification in this state, for the purpose of determining whether the same is unreasonable or discriminatory." (The entire section is printed in the margin. See pp. 478–480.)

In this case the following procedure was had: On August 1, 1922, the Wisconsin Inspection Bureau filed its Rule Book known as Exhibit A in this case; on the same day the commissioner of insurance issued an order approving

some and disapproving other proposed rules and regulations as set forth in the Rule Book, and finding certain rates unreasonable and establishing in lieu thereof rates found by him to be reasonable; thereupon the plaintiffs, among others, petitioned for a review of the order of August 1, 1922, and the commissioner by order dated August 14, 1922, fixed August 21, 1922, as the day of hearing; the hearing was adjourned from time to time, testimony was introduced on both sides, and on June 30, 1923, the commissioner entered the so-called final order, a review of which is sought in this proceeding. In this order the commissioner says:

"Many witnesses were sworn and a large amount of evidence introduced. My reasons for disapproval of the rules, rates, and forms in question are quite fully stated in my order of August 1, 1922, and it will serve no useful purpose to restate them. It is sufficient to state that after examining the evidence I am firmly convinced that my order was right."

The commissioner in the final order disapproves certain rules and regulations, and as to rates, with one very minor exception, affirms the order of August 1, 1922, by restating it.

We call attention to the last sentence of sec. 203.42: "Any finding or order of the commissioner in an investigation upon his own motion shall be subject to court review the same as if made after hearing upon a complaint as herein provided." This clearly contemplates that the commissioner shall, in acting on his own motion, proceed in the same way as if acting in response to a complaint. In this case the commissioner assumed that by the statute he was invested with power *ex cathedra* to find rates and charges unreasonable and discriminatory without having before him any evidence upon which such finding could be based. It is considered that the power of the commissioner with reference to the approval or disapproval of rules and regulations rests on quite a different basis than does his power to find rates unreasonable and discriminatory. The legislature may

undoubtedly vest in the commissioner of insurance power to determine whether rates are unreasonable and discriminatory, and, if he shall find them to be unreasonable and discriminatory, power to establish a reasonable rate.[1] In the case cited the language of the statute sustained was as broad and indefinite as is the language of the statute in this case. The power conferred by the statute must be exercised, however, in accordance with the established principles of law. In assuming that he might exercise the power to set aside and fix rates, conferred by the section arbitrarily. without a hearing, it is considered that the commissioner of insurance placed an interpretation upon the language of the act which is not at all warranted either by the purpose of the act or by its language. If the act be upheld as interpreted by the commissioner of insurance, it confers upon him managerial power rather than the power to regulate. That the rights of parties are vitally affected is clearly indicated by the record in this case. In his order of June 30, 1923, the commissioner announces that he is firmly convinced that his order of August 1, 1922, was right. It is quite apparent that the issue in the mind of the commissioner was not whether the rate fixed by the bureau was a reasonable or unreasonable rate, but whether or not his order of August 1, 1922, was right or wrong. The burden of proof was shifted so as to compel the bureau to show that the rate fixed by the commissioner was unreasonable and discriminatory instead of requiring evidence to be adduced to show that the rate fixed by the bureau was unreasonable and discriminatory, thus exactly reversing the position of the parties. In view of the fact that under the statute the parties affected by the order of the commission were entitled to a rehearing and review, it cannot be held that there was a denial of due process in this case; but the error of the commissioner in

---

[1] *German Alliance Ins. Co. v. Kansas*, 233 U. S. 389, 34 Sup. Ct. 612.

proceeding as he did arbitrarily to find the rates established by the bureau unreasonable and discriminatory from his own predilections and conceptions and to evolve from his inner consciousness a reasonable rate, is an error so fundamental in character as to pervade the whole proceeding. If the evidence adduced upon the review and rehearing had been before the commissioner at the time he made the original order, the question of whether or not the proof would sustain the order would be a close and doubtful one. It may be argued that by his determination in the final order that the order of August 1, 1922, was right, he necessarily determined the rates fixed by the bureau were unreasonable. But the method pursued put the presumption on the wrong side of the question, and it is impossible to say what the commissioner would have found from the evidence unaided by the presumption.

We do not review the findings of the commissioner as we would ordinary findings of fact because it is not within the province of the court by its judgment to establish a rate. That a finding or order not based on evidence cannot stand seems to be well established. The supreme court of the United States by BRANDEIS, J., said:

"The mere admission by an administrative tribunal of matter which, under the rules of evidence applicable to judicial proceedings, would be deemed incompetent (*United States v. Abilene & S. R. Co.* 265 U. S. 274, 288, 68 Lawy. Ed. 1016, 1022, 44 Sup. Ct. 565), or mere error in reasoning upon evidence introduced, does not invalidate an order. But where rates found by a regulatory body to be compensatory are attacked as being confiscatory, courts may inquire into the method by which its conclusion was reached. An order based upon a finding made without evidence (*Chicago Junction Case* [*Baltimore & O. R. Co. v. United States*], 264 U. S. 258, 263, 68 Lawy. Ed. 667, 673, 44 Sup. Ct. 317), or upon a finding made upon evidence which clearly does not support it (*Interstate Commerce Commission v. Union P. R. Co.* 222 U. S. 541, 547, 56 Lawy. Ed. 308, 311,

32 Sup. Ct. 108), is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process. Compare *New York ex rel. New York & Q. Gas Co. v. McCall,* 245 U. S. 345, 348, 62 Lawy. Ed. 337, 340, P. U. R. 1918 A, 792, 38 Sup. Ct. 122." [1]

There has never been a hearing and a finding by the commissioner made upon the statutory basis, for it is quite evident from the language of the statute itself, particularly when taken in connection with the language of sec. 200.11, that orders fixing rates are to be based upon evidence which is to be preserved. As to rates, the order of August 1, 1922, was void.

The matter of what constitutes a just and reasonable rate for services rendered and risks assumed by insurance carriers is a very difficult, complex, and complicated one. In his findings the commissioner of insurance ought to point out for what reasons and in what respects a particular rate is unreasonable or discriminatory. The statute contemplates that the rate is to be fixed by the bureau, and that the rate so fixed remains unless and until the commissioner finds upon sufficient evidence that it is unreasonable or discriminatory. The presumption of validity attaches, therefore, to the rate fixed by the bureau. The statute does not attempt to prescribe a basis of reasonableness as it might well do.[2] Nor does there seem to have been much progress made in arriving at a basis of reasonableness.[3] Parties are not to be deprived of their right of free contract nor are their liberties to be circumscribed except for weighty and sufficient reasons, and the mere fact that it is difficult to establish the necessity or ground for governmental inter-

---

[1] *Northern Pac. R. Co. v. Department of Public Works,* 268 U. S. 39, 45 Sup. Ct. 412.

[2] See *Ætna Ins. Co. v. Hyde,* 273 U. S. 681, 72 Lawy. Ed., Adv. Op. No. 5, page 163, 47 Sup. Ct. 113.

[3] Patterson, The Insurance Commissioner, p. 270 *et seq.*

ference does not remove the subject from the constitutional field into the domain of arbitrary power.

It is considered that the whole matter of rates should be recommitted to the commissioner of insurance, who should upon proper complaint or upon his own motion, if he is so advised, proceed with an orderly hearing upon which evidence should be adduced on both sides and the facts found accordingly. If the matter shall again reach the courts, we suggest that attention be given to the nature of the review to be had in the circuit court for Dane county. Can a review on *certiorari* of the proceeding before the commissioner, pursuant to the statute, be treated as an action to restrain the enforcement by the commissioner of his order on the ground that the order amounts to an invasion of the constitutional rights of the parties? Ordinarily, review on *certiorari* will be confined to questions disclosed by the record relating to the jurisdiction of the inferior tribunal or the proper exercise of such jurisdiction.[1] While in the petition for rehearing and review before the commissioner of insurance it was alleged that the order of August 1, 1922, operated to deprive the petitioners of rights guaranteed to them by the Fifth and Fourteenth amendments to the constitution of the United States and by the constitution of the state of Wisconsin, it is obvious that the commissioner of insurance had no power to determine questions of that character.[2] It is equally plain that the statute does not in terms attempt to enlarge the office of the writ of *certiorari* as it existed at common law. No doubt the constitutionality of the act as a whole can be determined in such a proceeding if the question be properly raised; but whether an order made

[1] *Stokes v. Knarr,* 11 Wis. 389; *Milwaukee Iron Co. v. Schubel,* 29 Wis. 444; *State ex rel. R. Connor Co. v. Wallman,* 110 Wis. 312, 85 N. W. 975; *Pollitz v. Michigan Railroad Comm.* 205 Mich. 549, 172 N. W. 611.

[2] *Pollitz v. Michigan Railroad Comm.* 205 Mich. 549, 172 N. W. 611.

pursuant to and in accordance with the act deprives a party of a constitutional right is a question of another character.

We suggest these matters without intimating any opinion upon them, so that if the question shall be raised in another proceeding we shall have the benefit of briefs of counsel. In this case we conclude that the commissioner did not act within the statute nor in accordance with the statute and do not reach the question of whether or not his order was invalid on constitutional grounds.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with directions to the circuit court to enter judgment affirming so much of the commissioner's order as approves or disapproves the rules and regulations filed by the bureau; setting aside so much of the commissioner's order as finds rates made by the bureau to be unreasonable and discriminatory, and committing the whole matter of rates to the commissioner for a hearing as indicated in this opinion; affirming so much of the commissioner's order as holds that the amendment of 1921 did not bring within the terms of the act consequential loss and damage insurance, leasehold interest insurance, rent insurance, storage charges, use and occupancy insurance, and consequential loss and damage insurance (tornado). No costs to be taxed, appellants to pay the clerk's fees.

VINJE, C. J., and STEVENS, J., took no part.