CLAM RIVER ELECTRIC COMPANY, Respondent, vs. PUBLIC SERVICE COMMISSION, Appellant.

*February 11—June 8, 1937.*

For the appellant there were briefs by the *Attorney General, L. E. Vaudreuil,* deputy attorney general, *Harold H. Persons,* assistant attorney general, *Ferris M. White,* special counsel, and *H. T. Ferguson,* counsel for the Public Service Commission, and a separate brief by *H. T. Ferguson,* and oral argument by the *Attorney General* and *Mr. White.*

For the respondent there were briefs by *Sanborn, Blake & Aberg, Glen H. Bell,* and *Philip G. Sanborn,* all of Madison, and oral argument by *Mr. Chauncey E. Blake* and *Mr. Bell.*

Briefs *amici curiæ* were filed by *Robert J. Cunningham* of Janesville, counsel for the League of Wisconsin Municipalities; by *Charles D. Madsen* of Luck, attorney, and *Charles E. Hammersley* of Milwaukee of counsel, for the Inter-County Municipal Power District of Polk and Burnett Counties; by *William Ryan* of Madison, and by *Earl Nelton* of Balsam Lake, attorney for the village of Balsam Lake.

ROSENBERRY, C. J.   An action to review an order of the Public Service Commission is heard and determined upon the record of the proceeding before the commission as certified by it to the clerk of the circuit court.   Sec. 196.41 (2), Stats.   From the record so certified it appears that under date of July 2, 1935, certain towns and villages situated in the counties of Polk and Burnett filed a resolution and a request for an election as provided by sec. 198.03 (1) ; that section being a part of ch. 198, Stats., relating to municipal power districts.   The Public Service Commission thereupon made an investigation of the feasibility or nonfeasibility of the proposed district, which report on feasibility was confirmed on July 8, 1935.   Not all of the municipalities embraced within the boundaries of the proposed district having voted favorably, the commission set the matter down for hearing on September 9, 1935, and on September 12th, after setting out certain facts, the commission in its approval said:

"In considering the evidence and arguments presented at the hearing, the commission is mindful of the fact that this is

the first proceeding to reach this stage under the power district law enacted by the 1931 legislature. As we read the statute the legislature intended to give a group of municipalities the same powers and privileges that a single incorporated municipality already had under existing statutes. The statute requires that the commission make a report on the feasibility or nonfeasibility of the originally proposed district within ninety days of the filing of intentions to form such district. This report, as above referred to, was made on June 4, 1935. The major change in the situation from the date of this report is the elimination of certain communities from the proposed district. As we see it, the only question now before us is whether the change in boundaries of the district is in itself a factor which would require us to disapprove the district altogether. . . . Sec. 198.06 (5) makes no mention of the commission making a finding as to the feasibility or nonfeasibility of the revised district. In fact, only ten days from the date of filing the certification of the vote is given to the commission for filing its 'approval or disapproval' of the revised district. If the legislature had intended that the commission would make a final determination of the feasibility or nonfeasibility of the revised district it seems clear to us that more than ten days would have been allowed for such determination. Apparently, therefore, the requirement of commission approval means only that the commission shall assure itself that the remaining communities in the district constitute a sufficiently integrated territory for practical physical operation. We do not believe we are called upon to determine, as one utility representative urged, that the district has shown it will surmount all limitations and obstacles. We do not believe that the statutory requirement means that the commission must place its stamp of approval on the securities of the proposed district or the ultimate financial and economic success of the district any more than the commission in granting a certificate of authority to a private utility to enter the utility business guarantees the ultimate success of such enterprise. In other words, under the statute the commission is not an overlord of the wishes or economic judgment of the citizens in a community concern of this kind. It is not the board of directors of the district nor a superboard of directors of the district. The commission's functions generally under the power district law, as we see

them, are a mixture of advisory, permissive and regulatory duties.

"Having considered the information of record and the views of counsel, and in the exercise of its duty under sec. 198.06 (5), Stats., the commission hereby approves said district as created by said election and directs the secretary of the commission to file this approval," etc.

This is the order which is sought to be reviewed. The order is assailed here on the ground that the municipal power district law is invalid because it delegates legislative power to the Public Service Commission to create a municipal corporation. This the legislature may not do. *In re Incorporation of Village of North Milwaukee* (1896), 93 Wis. 616, 67 N. W. 1033; *State ex rel. Mueller v. Thompson* (1912), 149 Wis. 488, 137 N. W. 20. See also *State ex rel. Carey v. Ballard* (1914), 158 Wis. 251, 148 N. W. 1090; *Klein v. Barry* (1923), 182 Wis. 255, 196 N. W. 457.

If the municipal power district act sets up no standard and confers upon the Public Service Commission an unlimited and uncontrolled discretion to approve or disapprove, there can be no doubt that it would be an attempt unlawfully to delegate legislative power. *State ex rel. Wis. Inspection Bureau v. Whitman* (1928), 196 Wis. 472, 220 N. W. 929. The first question for decision is, Is a sufficient standard to be found within the act? The act (sec. 198.03, Stats.) provides that if the governing bodies of one half or more of the municipalities included within the proposed district shall pass certain resolutions and file the same with the proper county clerk, the county clerk shall thereupon (sec. 198.04) notify the Public Service Commission of such filing and that the municipalities have petitioned him to call an ·election. Upon receipt of that notice (sec. 198.04 (2)) the commission is required within ninety days to—

"file in writing with said clerk its recommendation as to the

feasibility or nonfeasibility of the proposed district with reasons therefor."

The section also requires that copies of such recommendations be filed with the clerk of each municipality within the proposed district. Upon receipt of such recommendations or the expiration of the ninety-day period, the clerk is required to call an election as provided in the chapter.

Sec. 198.06 (5), Stats., provides: ". . . In case said district as finally constituted shall comprise a smaller area than originally proposed, because of the failure of one or more municipalities to approve the district at said election, then within ten days following such filing with the commission such commission shall file its approval or disapproval of said district as created by said election with the secretary of state, the clerk of each municipality included in such district, and with said county clerk. In such case, from and after such filing by the commission the creation and incorporation of such district shall be deemed complete, or the district shall be deemed dissolved, as the approval or disapproval of the commission shall determine," etc.

It is argued on behalf of the Public Service Commission that the approval or disapproval of the district, the boundaries of which have been determined by the election, requires a finding of fact on the part of the commission that such district is feasible or nonfeasible; that the duty of making the same finding rests upon the commission after the election as the statute placed upon it prior to the election.

Attention is called to the fact that it is doubtful whether or not the commission in its report made a finding of feasibility or nonfeasibility. The commission concluded its report in the following language:

"In summary, the commission advises that in its opinion, the proposed inter-county power district is feasible physically and might be made feasible economically from the standpoint of customers if,

"1—The debt incurred to acquire present property or build necessary plant and equipment for serving present customers and/or new customers within moderate distance of present facilities is not too great for present or reasonable expected customers' ability to pay, and/or

"2—Funds are supplied at least in part from other sources than the power district itself or its customers; and/or

"3—Interest rates of substantially less than 6% can be secured; and

"4—Amortization of debt, in whole or in part, is not made the sole obligation of the power district customers, at least in the initial years of operation, and

"5—Continuing, adequate supervision and management of both operation and construction is and can be applied with approximately a $10,000 annual saving in general expenses now incurred."

The determination of the commission is limited, (1) to financial feasibility. It does not find whether the district is feasible economically, but that it might be made feasible economically by removing all of the conditions thereafter specified. What the act did was to confer upon the commission the duty to evaluate all of the factors relating to feasibility, and upon the basis of that evaluation to determine whether or not the proposed district was feasible or nonfeasible. The commission is a body of experts and has at its command a staff of experts in this field. What the legislature clearly intended was that the people of the proposed district should be advised as to whether in the judgment of the Public Service Commission the proposed power district was a feasible project. Almost all projects would be feasible if enough conditions were removed.

Any businessman about to enter upon a new industrial enterprise would make a thorough investigation to determine whether or not the project was feasible,—that is, whether or not there was reasonable probability of its future successful operation. The meaning of the word "feasibility" as used in this connection seems to be plain. It is a word frequently

used in ordinary business parlance, and as so used its meaning is well understood. The very feasibility of the project may depend upon whether the debt which it will probably be necessary to incur is too great; whether funds can be supplied elsewhere than from the district; at what rate of interest funds can be supplied; how the debt of the district may be amortized; and what the probable saving of general expenses would be. These are the very factors along with others which the commission is under obligation to consider in determining feasibility. However, the act attaches no legal consequence to the failure of the Public Service Commission to comply with the statute, in its report on feasibility made prior to the election. Even though the Public Service Commission finds it is not feasible, nevertheless under the law the people of the district may vote to incorporate. We have discussed the matter somewhat at length because of its relation to the provisions of sec. 198.06 (5), Stats., considered later.

Under the act if some of the municipalities in the proposed district vote "No" they are eliminated from the district. By such elimination it is apparent that the boundaries of the district as thus fixed are different than those of the proposed district, upon which the Public Service Commission passed as to feasibility or nonfeasibility. It cannot be said that the electors by their votes have determined that the district as thus constituted is feasible or nonfeasible. Prior to the election no elector knew or could know what the boundaries of the district would ultimately be if some municipality voted in the negative. Each municipality voted to be incorporated in a district which should be composed of such municipalities as voted favorably. Therefore, there could be no determination of feasibility or nonfeasibility by the electorate of the district fixed by the election. To provide against this contingency the legislature established a procedure to be followed in such cases and conferred upon the Public Service

Commission the power to approve or disapprove the district as created by the election. It is implicit in this provision in our opinion that such approval must be based upon a finding by the commission of feasibility or nonfeasibility of the district as determined by the election. There are many considerations which lead us to this conclusion. Under sec. 198.04 (2), Stats., the sole function of the Public Service Commission is to determine the feasibility or nonfeasibility of the proposed district. It is not required to give advice or make findings in regard to any other matter. When it comes to the matter of approval or disapproval of the district as fixed by the election, it is required to file its approval within ten days of the time the result of the election is certified to it. The commission was of the view that if its duty was more than permissive, the legislature would have provided a longer period than ten days for examination of the question. It is considered, on the contrary, that it is a clear indication that the thing to be determined is feasibility or nonfeasibility, and that it is to be determined upon the basis of the first examination made by the commission. In this case the commission considered feasibility under three heads:

(a) Physical operating conditions.

(b) Market conditions.

(c) Financial conditions.

There are attached to the report eleven tables which give in great detail the required information in regard to each of the municipalities within the boundaries of the proposed district, together with a survey of the property and financial condition of the utilities presently operating within the proposed district, and apparently ample evidence to enable the Public Service Commission to act with full knowledge of all relevant facts. Upon the basis of its preliminary report, all that was necessary to do was to subtract the municipalities eliminated from the proposed district by the election and pass upon the feasibility or nonfeasibility of the remainder.

No doubt this was what the legislature contemplated, hence the brief period of time given within which the commission was required to file its approval or disapproval.

The legislature could hardly have intended that the matter of feasibility or nonfeasibility should in the first instance be determined by the Public Service Commission and then passed upon by the electorate with respect to the proposed district, and that when it came to the matter of the incorporation of the district as fixed by the election leave the matter of feasibility undetermined either by the electorate or the Public Service Commission. Hence, the act requires the approval or disapproval of the commission when any municipality votes in the negative. At no other point in the proceeding did the matter of feasibility or nonfeasibility of the district as fixed by the election arise. Therefore, it is implicit in the act that the approval or disapproval must depend upon feasibility or nonfeasibility.

It is the duty of this court, if the act is subject to a construction which brings it within the provisions of the constitution, to adopt that construction as against one which renders the act invalid.

That the standard is implicit in the statute follows for the same reason in this case as it did in the construction of ch. 444, Laws of 1919, sec. 1636—12m, Stats. of 1919, now sec. 175.07. By the terms of that act persons were forbidden to act as private detectives without first having obtained a license so to do. Any person desiring a license was required to file an application in the office of the secretary of state. The application was required to state the age, residence, present and previous occupation of the applicant—

"and such further facts as will show the good character, competency and integrity of the applicant."

The secretary of state when satisfied from an examination of such application and such further inquiry and investiga-

tion as he shall deem proper of the good character, competency and integrity of such applicant was required to issue a license. The act further provided that the application must be approved in each instance by the fire and police commission in those cities which had such commission and in those where there was no fire and police commission by the chief of police. It was contended that the act was unconstitutional because it provided no standard nor test of qualification to guide the fire and police commission or the chief of police of the city in approving an application for a license, and it was claimed that it therefore vested the fire and police commission or the chief of police with an arbitrary power to give or withhold their approval and so in effect to permit or deny a license to the applicant. The court said:

"The test and standard of qualifications prescribed by the statute for obtaining the license is that the applicant shall be a person of good character, competency and integrity. . . . It is strenuously asserted that the provisions of sec. 2 of this act do not prescribe any standard of qualifications upon which the fire and police commission or chief of police are to act in granting or withholding approval of the written application for such a license to the secretary of state, and that the provisions of the act permit them to deny their approval in an arbitrary manner. A reading of the whole act and a study of the relations of its various provisions indicate that the legislature had in mind a regulation of private detective business for the purpose of securing the business against persons who lacked good character, competency, and integrity, and to assure the public that those persons licensed to engage in this business possess these qualifications. The provisions of sec. 2 must be construed in view of this object. . . . It naturally follows from this that approval or disapproval of the application is to be based on such standard of qualifications and that the facts shown by the written application are to be acted on by the persons designated in the statute to perform this duty. . . .

"The object sought to be accomplished by the act is that only such persons are to be licensed to engage in private de-

tective business as meet the calls of the standards prescribed by the legislature. . . .

"If, under the pretense of exercising the power of disapproval, the fire and police commissioners and the chief of police act, in manifest disregard of the facts before them, resulting in injustice, gross abuse, or avoidance of duty, the power of the courts can be invoked to redress the wrong, on the ground that such action in contemplation of law is not a discharge of a discretionary duty, but a substitution of an 'arbitrary and fraudulent disposition and determination of the question submitted for the honest discretion demanded by law.' " *Pinkerton v. Buech* (1921), 173 Wis. 433, 437–440, 181 N. W. 125.

On these grounds the statute was held valid and not an improper delegation of power to the fire and police commission or to the chief of police.

In *Milwaukee v. Ruplinger* (1914), 155 Wis. 391, 396, 145 N. W. 42, 44, the court had under consideration an ordinance of the city of Milwaukee licensing junk shops and requiring that all applications for licensing junk shops shall be made to the mayor, who may grant or refuse to grant such license as to him may seem best for the good order of the city, it was contended that this ordinance conferred upon the mayor arbitrary power and was invalid as a delegation of legislative authority. The court said :

"The idea embodied in the ordinance, by reasonable, if not necessary inference, is that any suitable person, considering all things bearing on the question, for the operation of the junk business, shall, if he desires, upon compliance with the ordinance, have a license to run such business. Manifestly, the question of suitability must depend upon the existence or nonexistence of facts and the facts must vary somewhat according to character, temperament, age, history, and many other things."

It was held that the ordinance was not invalid and that the mayor might pass upon the suitability of the candidates for licenses reasonably and upon his best judgment.

In each of these cases the standard which was to guide the administrative officer was not explicit but was nevertheless implicit in the language of the act.

It is manifest that under the provisions of sec. 198.06 (5), Stats., the approval or disapproval of the commission must rest upon something. It must rest necessarily upon some determination of fact or it must lodge in the Public Service Commission the power to exercise legislative discretion as to whether or not a corporation shall come into being. If it be held to require it to make a determination of fact, the act is valid. If it be held that there is power to exercise legislative discretion, it is invalid. It being a permissible construction for the reasons already given, it is therefore the duty of this court to hold that the act requires that the commission make a finding of fact upon which its approval or disapproval must be based.

It is urged, however, that feasibility, even if that term be imported into sub. (5), does not constitute a standard sufficiently definite to answer the requirements of the law. The commission itself had no difficulty in determining what was meant by feasibility as opposed to nonfeasibility. The commission examined the proposal in this case and considered and evaluated some of the factors upon which a determination of feasibility or nonfeasibility must rest. In its first report the commission set out all of those factors, evaluated many of them, but did not arrive at a final conclusion. It qualified its determination by annexing certain conditions. If it had evaluated the factors which it found to be present and announced a determination there would have been a compliance with the statute. The commission under the statute is required ultimately to determine upon the basis of the factors present whether the project is feasible or·nonfeasible, that is, whether it is reasonably probable that if the proposed district be incorporated it can be operated success-

fully under the conditions existing in the particular district. By this the commission is not required to guarantee results. It is only required to reach a decision upon the facts. Upon its determination of the ultimate fact the statute operates upon the finding to create the district. The statute says in such cases, if and after such filing by the commission (filing of its final approval) the creation and incorporation of such district shall be deemed complete or the district shall be deemed dissolved as approval or disapproval shall determine. If a district has been approved by all of the municipalities within the district as proposed, the creation and incorporation of such district shall be deemed complete from and after the filing of the result of the election with the secretary of state.

In the matter of incorporation of villages, the applicants for incorporation are required to make an application to the circuit court for an order of incorporation. If upon the hearing the court finds the necessary facts (sec. 61.08, Stats.), the court enters an order of incorporation and appoints three persons as incorporators of election. The statute then provides that if a majority of the votes cast at such meeting are against incorporation no further proceedings shall be had, but if a majority vote for the corporation, the territory shall be deemed a body corporate. What the court does is to find facts which in a certain contingency result in the holding of an election. If the result of the election is favorable the statute itself operates to bring the corporation into existence. While the order of the court is called an order of incorporation, it is merely a preliminary step in the process of incorporation. After the decision in *In re Incorporation of Village of North Milwaukee* (1896), 93 Wis. 616, 67 N. W. 1033, the statute was amended to conform thereto. See also *Lerner v. Delavan* (1930), 203 Wis. 32, 233 N. W. 608; *Kreutzer v. Westfahl* (1925), 187 Wis. 463, 204 N. W. 595;

*Petition of State ex rel. Attorney General (Tavern Code Authority)* (1936), 220 Wis. 25, 264 N. W. 633. So under the provisions of sec. 198.06 (5) when the ultimate fact of feasibility or nonfeasibility is found and the district approved or disapproved accordingly, the statute itself incorporates or denies incorporation as the case may be.

The statute being valid under its terms, the commission being required to base its approval or disapproval upon feasibility or nonfeasibility of the district as fixed by the election, the question is presented whether or not the commission complied with the statute. It is manifest from a consideration of the language in which the commission couched its approval that it distinctly declined to make such finding and held that it was under no duty so to do. Apparently the commission was of the view that it might give or withhold its approval accordingly as it thought the people of the district should or should not have a chance to proceed with the project irrespective of its probable final outcome. No doubt the duty of the commission to approve or disapprove upon the basis of feasibility or nonfeasibility puts the Public Service Commission in a rather difficult position, that of apparently thwarting the desires and purposes of a certain group of citizens in case it disapproves. However, that is a matter of policy for the legislature. The legislature has said that a group of citizens of a district fixed by an election may not proceed unless the district as fixed by the election is feasible. While the responsibility for making the finding is on the commission, the ultimate responsibility is upon the legislature. The legislature quite apparently thought that the results of an election might be such as to make it detrimental to the public interest to have the project proceed. No one will be the gainer by the creation of a municipal power district unless it can be successfully operated. If there is no reasonable prospect of successful operation then no one should wish it to proceed.

As has already been pointed out, the Public Service Commission is a body of experts and has at its command a staff of experts. No public authority within the boundaries of the state is so competent to pass upon questions of fact involved as is the Public Service Commission. No matter what its finding may be, it may be subject to unjust and adverse criticism by one side or the other, but all governmental agencies called upon to make decisions are subject to the same sort of attack. That, however, does not excuse it from the performance of its statutory duty.

It is considered that in the respects considered the act is valid; that the Public Service Commission made no finding as to the feasibility of the district as fixed by the election; that its approval resting upon no finding of fact is ineffectual; that its refusal to find that the district as fixed by the election is feasible is in effect a finding that it is nonfeasible and therefore cannot be approved. The district as fixed by the election is either feasible or nonfeasible; there is no gap between the two. If the municipalities in the district fixed by the election wish to proceed in spite of the disapproval of the commission, they can at a proper time embody the district in a new proposal and proceed in spite of the commission. The statutory provisions permit of that.

After this case had been under consideration for some time, the court requested briefs to be filed upon the following questions:

"(1) Can the state by legislative enactment validly transfer or make available to a power district to be created under ch. 198, the right to acquire the property of a public utility operating under an indeterminate permit granted pursuant to the provisions of ch. 196, without the consent of

"A. The municipality which granted the franchise,

"B. The public utility to which it was granted?

"(2) Is the provision contained in sec. 198.13 to the effect that 'the continued operation of any such utility from and

after the organization of such district by the owner or by the lessee or the receiver of the owner' shall amount to consent by the owner that its property is subject to the act, valid in view of the fact that a utility operating under an indeterminate permit may subject itself to liability if it fails to render service?"

In response to this request able and exhaustive briefs were filed by counsel on both sides and by friends of the court. We have given these briefs and the whole matter our most careful and thorough consideration. The municipal power district act bristles with difficult complicated legal questions of the very greatest importance to the people of the state and to the owners of public utility properties. It appearing in this case that there is in existence no valid municipal power district having in view the complexity of the questions involved, it is considered that questions other than those considered should not now be determined. In view of the state of the record a decision upon those questions would be merely advisory, not even declaratory of the law. For these reasons it is considered that any determination with respect to the questions suggested or other questions involved should be postponed until such time as they are presented in a proper case with parties who have an immediate interest therein. For these reasons we have thought it best not to discuss the matters presented in the briefs. Briefs, however, have been helpful in enabling the court to get a grasp of the fundamental problems involved.

*By the Court.*—The order appealed from is affirmed.

The following opinion was filed June 16, 1937:

FOWLER, J. (*dissenting in part*). I concur in the affirmance of the judgment of the circuit court in this case, but for a reason directly contrary to the opinion of the court as to the construction of the act under which attempt is made to

form the instant power district. In my opinion the judgment of the circuit court should be affirmed because said act delegates legislative power to the Public Service Commission (hereinafter referred to as the "commission") to create a corporation. This, as the opinion of the court states, the legislature cannot constitutionally do. The court holds that the act does not delegate such power, but affirms the judgment on the ground that the commission in "approving" the creation of the district failed of its duty under the act as the court construes it by failing in its order of "approval" to find as a fact that the creation of the district is "feasible."

There is no language in the act that in express terms requires any finding of fact by the commission as a condition for or basis of its "approval" of the creation of a district. The opinion of the court holds not only that a finding of fact by the commission is necessary as a condition of its "approval," but that such finding shall be that the district is "feasible," and then goes on to define in a general way the word "feasible" which the legislative act itself does not purport to define in any way. This is a far reach. The court in effect holds that the act does not delegate legislative power to the commission because the court has the power to insert in the statute clauses that the legislature did not insert therein. This is legislation by the court. We do not avoid the constitutional objection of delegation of legislative power by substituting for legislation by the commission legislation by the court. The legislature can no more delegate to the court the legislative function of declaring what facts must be found by the commission as condition of its "approval" of a district than it can delegate such function to the commission. *In re Incorporation of Village of North Milwaukee,* 93 Wis. 616, 67 N. W. 1033.

As above stated, there is no language in the act that expressly requires that the commission shall find either "feasi-

bility" or the facts that constitute "feasibility." The court reaches its conclusion that the commission is directed to find feasibility as a fact as a condition of its approval of the creation of a district merely upon two short and far separated statements contained in the act. The first statement is sec. 198.04 (2), Stats., which provides that within ninety days after notice of an application for the formation of a power district the commission "shall file in writing . . . its recommendations as to the feasibility or nonfeasibility of the proposed district with reasons therefor." The other is a page or two farther on in the act, sec. 198.06 (5), Stats., and is to the effect that when part but not all of the municipalities in the proposed district have voted for the creation of the proposed district, then within ten days after the filing with the commission of a certificate showing the result of the election the commission shall file with the secretary of state "its approval or disapproval of said district as created by said election" a district with boundaries different from the district proposed, and "from and after such filing . . . the creation and incorporation . . . shall be deemed complete, or the district shall be deemed dissolved, as the approval or disapproval of the commission shall determine." The clause last quoted to my mind very clearly shows that the act places with the commission the power to "determine" whether the municipalities voting for the creation of the district as proposed themselves shall or shall not constitute a district consisting of a part only of the municipalities in the district proposed, and the only thing requisite to such determination is "approval" or "disapproval" by the commission of a district so comprised. The opinion of the court bases its conclusion upon the intention of the legislature. "The intention of the law-making power must be ascertained from the language used to express that intention, and it is only when the language used is uncertain, indefinite, or ambiguous that

resort may be had to construction." *Estate of Singer,* 192 Wis. 524, 527, 213 N. W. 479. See also *State ex rel. Associated Indemnity Corp. v. Mortensen,* 224 Wis. 398, 272 N. W. 457. Each of the words "approve" and "disapprove" carries a meaning that is neither ambiguous, indefinite, or uncertain. Why construe them as comprising something aside from and beyond their plain, definite, and certain meaning? By the terms of the act the commission by merely writing "we approve" or "we disapprove" can make or prevent the making of a power district, without determining any fact whatever. It can "approve" or "disapprove" according to its discretion. Its approval or disapproval may result from mere whim or caprice. Its approval or disapproval may result from whether its members favor or are opposed to municipal ownership as a general proposition; whether they believe that nonmunicipal public utilities have or do not have too great powers; whether they believe as a general proposition that such utilities further or are inimical to public interests. If the legislature intended the creation of a district to depend on a finding of feasibility as a fact by the commission it might easily and presumably would have so said. It would have been as easy so to say as to say "approve" or "disapprove." Why impute to the legislature the stupidity of concealing the meaning of fact-finding by hiding it behind words in common use and commonly understood that neither carry nor imply such meaning? Legislatures in these days of national codes, state codes, authorities, boards, commissions, and the like, are, as Mr. Justice CARDOZO phrased it in *A. L. A. Schechter Poultry Corp. v. United States (NRA Code Case),* 295 U. S. 495, 553, 79 L. Ed. 1570, 1592, "running riot" in their willingness and attempts to delegate legislative power.

The opinion of the court bases its inference of intent of the legislature to impose on the commission a finding of

feasibility upon the provision that on the filing of an application for a power district the commission must within ninety days report in writing "as to the feasibility or nonfeasibility" of the district as proposed. But a report of finding of feasibility is not necessary to the creation of the district as proposed. If all the municipalities comprised in the proposed district vote for its creation, it is created although the report of the commission is that it is not feasible. The opinion of the court concedes this. Why impute a finding of feasibility as condition of creation in case only part of the municipalities vote favorably when such finding is not essential when all so vote? "Feasibility" as defined by the court is as desirable and as necessary in the former case as in the latter. As the legislature negatived intent of "feasibility" in the former, why imply it in the latter? Plainly, the legislature's intent was that if a majority of the voters in each of the municipalities wanted a power district they should have it. Just as plainly, to my mind, it intended that if a majority of the voters in a part but not all of the municipalities wanted a power district they should have it providing the commission wanted to let them have it.

The opinion of the court does not stop with reading into the statute a finding of feasibility not contained therein, but goes on to define in a general way feasibility, which the act itself does not purport to define, even in connection with the initial report of the commission "as to feasibility or nonfeasibility." In the first instance the commission is plainly left to use its own interpretation of "feasibility." The commission in its initial report and in its final order of approval, as the opinion of the court discloses, inferred that the legislature intended it to use its own interpretation of the word. The commission was perhaps closer to the legislature, and better informed as to its actual intent, than the court. That the legislature did not intend to lay down a definition

of feasibility, or understand that it was laying down a defini-
tion, is indicated by the provision respecting the preliminary
report of the commission "as to feasibility or nonfeasibility"
that in the report the commission should give its "reasons
therefor." The commission is to give its own reasons; not
limit its report on feasibility to consideration of any standard
or definition of feasibility declared by or contained in or im-
plied from the act itself.

If the statute be construed as implying that the "approval"
of the commission must rest on a finding of "feasibility,"
there is still no definition of "feasibility" in the act to supply
a standard on which to base an "approval." The dictionaries
give several meanings to the word "feasible:" "Capable of
being done, executed, or effected; possible of realization; . . .
successful in operation." Webster. If the last phrase quoted
be taken as the meaning of the word, does "successful" mean
capable of furnishing service at a reasonable rate, at a rate
the consumers will pay, capable of being self-supporting,
capable of operation if supported by taxation as the act im-
plies it may be, or successful if existing utilities within the
district be taken over by the district as the act provides may
be done? And how would the commission know which of
these meanings to give to the word "successful." The court
steps in here by its opinion and endeavors to help out the
commission in future cases, if any there be, by covering part
but not all of the hypotheses above stated. But how can the
court, any more than the commission, know which of the sev-
eral meanings of the phrase "capable of successful operation"
the legislature intended, and what right has the court to say
which one the legislature intended, when as matter of fact
it does not and cannot know, even if it assumes that the legis-
lature had some specific definition of the phrase "successful
in operation" or the word "feasible" in mind when it passed
the act?

The provision that the commission must within ten days approve or disapprove indicates to my mind, as the opinion of the court shows the commission thought, that the legislature could not have intended any specific finding of feasibility in the sense that the court defines it, because it gave no time to it for ascertaining the basic facts on which a finding of feasibility as defined by the court must rest.

It was held in the *Schechter Case, supra,* that legislative power was unconstitutionally delegated which purported to authorize the making of a code by the "approval" of the President without setting up any standard aside from the general aim of "rehabilitation, correction and development of trades and industries." The word "feasibility" in the statute indicates nothing more at most than a general aim, if it implies that. The mere "approval" of the commission can no more create a municipal corporation, than that of the President can create a code. In my opinion there cannot be a delegation of power to make a finding of feasibility without stating the facts which constitute feasibility. If a term be used which has only one meaning, or a meaning fixed by common use or by a statute, then the term supplies a standard. It seems to me that our own *Tavern Code Authority Case (Petition of State ex rel. Attorney General,* 220 Wis. 25, 264 N. W. 633) illustrates what may and what may not be a sufficient delegation of power. The court there held that as to delegating power to prohibit "unfair" trade practices, the delegation was sufficient because what constitutes "unfair" trade practices is indicated in statutes and decisions under them relating to trade practices. But that as to determining what constitutes "fair" trade practices, the statute neither directly nor by inference or implication furnished a standard for making such a determination, and the statute was void so far as it attempted to delegate such power. It seems to me that the phrase "successful operation" less

definitely indicates its meaning than does the phrase "fair trade practices." Common knowledge affords at least some capability for determining what is "fair" in trade practices. It affords no capability for determining whether a public service corporation can successfully operate in a given territory. In my opinion the court has no right to say what facts the legislature had in mind if it did have in mind and intend that the commission should find feasibility as a basis of its approval. To do so is not merely to declare what the language of the legislature means or implies, which is the sole function of the court in construing a statute. It is going a long way beyond that. The court is furnishing a standard that the legislature failed to furnish. It is putting in the statute a defining phrase, "successful in operation," that the legislature not only did not put into it, but did not indicate that it meant to put into it and then defining the meaning of that phrase.

The opinion of the court cites *Milwaukee v. Ruplinger*, 155 Wis. 391, 145 N. W. 42, and *Pinkerton v. Buech,* 173 Wis. 433, 437, 181 N. W. 125, in support of its contention that the instant act supplies a standard by which the commission is to determine feasibility. In the former the matter involved was simply whether the mayor of a city could determine the fitness of a person to run a junk shop. Common knowledge would supply the facts reasonably necessary to determination whether a license should be granted an applicant. The opinion of the court in that case is in effect that there is no need to put into an ordinance as basis for licensing what common knowledge and common sense indicate must constitute the basis. In the latter the application for a license as a detective was required by the licensing statute to state the city wherein the applicant proposed to do business and "such further facts as will show the good character, competency and integrity" of the applicant. The language quoted

is manifestly a specific statement of the qualifications deemed by the common council necessary for the granting of a license. The mere granting of licenses to follow a trade or to carry on a business seems to me far different from the matter here involved. Determination of fitness, where vested by ordinance in a specified licensing officer, is held to be a ministerial, not a legislative, function. *Wright v. May,* 127 Minn. 150, 149 N. W. 9; *State v. Briggs,* 45 Or. 366, 77 Pac. 750, 78 Pac. 361; *Racine v. District Court,* 39 R. I. 475, 98 Atl. 97. It is stated in 17 R. C. L. p. 535, § 52, that—

". . . The authorities are directly to the purport that in the regulation and licensing of trades, occupations, callings, and professions which affect the public welfare the legislature must enact the law necessary to accomplish the object in view; but it may be carried into execution by some officer or board appointed for that purpose, and such officers or board may be authorized to prescribe the qualifications of those desiring to follow such callings or professions."

More to the point of the instant case is our *Tavern Code Authority Case, supra,* and the *Schechter Case, supra,* and *State ex rel. Adams v. Burdge,* 95 Wis. 390, 70 N. W. 347. The case last cited holds that a statute by its terms conferring on the state board of health power to make such regulations "as may in its judgment be necessary for the protection of the people" from contagious diseases and to designate what diseases are "contagious or dangerous to the public health" delegates legislative power. What is said in the opinion of the court in the instant case about the commission being a body of experts and competent to do what the opinion says it should have done might as fittingly be said about the state board of health and its doing what the statute involved in the *Burdge Case* said it might do.

The plaintiff in the instant case contended; not only that the statute involved delegated legislative power, but that it is unconstitutional because it violates the contract clause and

the due process clause of the United States constitution. The court ruled against the plaintiff on its first proposition, and declined to mention the others except to say that the statute "bristles" with legal questions. Perhaps in view of the importance of these "bristling" questions, affecting as some one or more of them conceivably may every public utility, every municipality, and every taxpayer in the state, they not only ought not to be decided herein because in this case a ruling could not be obtained on the federal questions involved by the supreme court of the United States, but some of the more important of them ought to be specifically stated.

Has an existing utility, and has the municipality in which it is located, any contract obligations under the indeterminate permit provisions of the utility law; and if so, does the instant act, in violation of the contract clause of the United States constitution, impair any such obligation?

Does the declaration of the statute that a power district is a municipal corporation make it such when it has no governmental functions, except the power of taxation to enable it to furnish the service it is created to supply, if the power of such taxation may be constitutionally granted to it, or is such a district, despite the declaration, merely a business corporation devoted to a public service like any other utility under the public utility law?

Can the legislature, in the exercise of the state's power of eminent domain, after conferring on an existing utility the power of eminent domain and devoting it to the furnishing of a particular public service within a municipality, confer on a power district the right to take over under the public utility law such utility, to be devoted to the same public service for the district that the utility is satisfactorily supplying to the municipality?

If, as the act by its terms provides, a power district can take over under the public utility law a utility within its limits,

can the legislature empower the district to take over any part of the utility's property less than the whole, as the act purports to empower the district to do, without violating the due process or the contract clause of the United States constitution?

Can the legislature, as the act by its terms provides, prohibit an existing utility within the limits of a power district from extending or making additions to its plant without procuring a permit from the power district in the cases in which under present provisions of law the utility is required to get a permit from a local municipality or the commission?

Can the legislature, as the act provides, constitutionally subject all property within a power district to taxation for the debts of the district regardless of whether the owner receives the benefit of the service the district is created to supply?

Some but not all of the questions above stated with which the power district act "bristles" were discussed in the briefs submitted to the court. The questions are here propounded without indicating the opinion the court may now or eventually have upon any one of them, but solely in the hope that the legislature may give them consideration in case it amends the existing act.

I am authorized to state that Mr. Justice FAIRCHILD concurs in this opinion.